UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

D-06 LEONARD ("BO") MOORE,
D-15 JOHNNY JARRELL,
D-27 ROBERT FLOWERS,
D-36 SEAN DONOVAN,

        Defendants.

_____/

Case No. 06-20465

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING DEFENDANTS' RULE 29 MOTIONS FOR ACQUITTAL AND RULE 33 MOTIONS FOR A NEW TRIAL [1669, 1670, 1671, 1752, 1757, 1759, 1791]**

This matter comes before the Court after an extensive jury trial that began on November 2, 2010 and concluded with guilty verdicts on December 8, 2010. Defendants LEONARD "Bo" Moore, Johnny Jarrell, Robert Flowers, and Sean Donovan, along with numerous other individuals, were charged in a second superseding indictment with violating federal racketeering laws and other federal laws involving violent acts, firearms, controlled substances, and stolen property. The jury returned the following guilty verdicts:

D-06 Leonard "Bo" Moore

| | | |
|---|---|---|
| Ct. 1 - | 18 U.S.C. § 1962(c) | Racketeer Influenced and Corrupt Organization ("RICO") - Conducting or Participating in affairs of an Enterprise through a Pattern of Racketeering Activity |
| Ct. 2 - | 18 U.S.C. § 1962(d) | Conspiracy to violate RICO |
| Ct. 9 - | 18 U.S.C. § 1959(a)(3) | Assault with a dangerous weapon in aid of Racketeering ("Megdanoff Shooting Incident) |
| Ct. 15 - | 18 U.S.C. § 2312, 371 | Conspiracy to transport stolen vehicles in |

| | | Interstate Commerce ("Myrtle Beach") |
|---|---|---|
| Ct. 19 - | 21 U.S.C. § 846 | Conspiracy to Possess with intent to distribute and Distribution of Controlled Substances ("Nagi Drug Conspiracy") |
| Ct. 33 - | 18 U.S.C. § 924(c) | Use of Firearm during and in relation to crime of violence (Megdanoff Shooting Incident) |

<u>D-15 Johnny "JD" Jarrell</u>

| Ct. 2  - | 18 U.S.C. § 1962(d) | Conspiracy to violate RICO |
|---|---|---|
| Ct. 19 - | 21 U.S.C. § 846 | Conspiracy to Possess with intent to distribute and Distribution of Controlled Substances ("Nagi Drug Conspiracy") |

<u>D-27 Robert "Kwik" Flowers</u>

| Ct. 2  - | 18 U.S.C. § 1962(d) | Conspiracy to violate RICO |
|---|---|---|
| Ct. 19 - | 21 U.S.C. § 846 | Conspiracy to Possess with intent to distribute and Distribution of Controlled Substances ("Nagi Drug Conspiracy") |

<u>D-36 Sean Donovan</u>

| Ct. 17 - | 21 U.S.C. § 846 | Conspiracy to Possess with intent to distribute and Distribution of Cocaine ("Burton Drug Conspiracy") |
|---|---|---|

The Court now considers the following defense motions seeking either acquittal or a new trial:  (1) Defendant Johnny Jarrell's motion for acquittal and/or new trial [1752], (2) Defendant Sean Donovan's renewed motion for a judgment of acquittal or for a new trial [1757], (3) Defendant Leonard "Bo" Moore's consolidated motion for new trial pursuant to Rule 33 and judgment of acquittal pursuant to Rule 29 [1759], and (4) Defendant Robert Flowers's motion for acquittal and/or new trial [1791].  For the reasons stated below and on the record at the June 21, 2011 motion hearing, this Court DENIES Defendants' motions.

## I.   Background

During the course of this month-long jury trial, approximately 35 witnesses, including Co-Defendants, testified and hundreds of exhibits, including wire-tapped phone calls, were

2

entered into the record.  A brief overview of that evidence is as follows.

Defendants share a common factor.  There is testimony at trial that each was a member of the Highwaymen Motorcycle Club ("HMC").  (*See, e.g.,* Trial Tr. Vol. 7, C. Miller at 35-36 [Bo Moore and Sean Donovan].)  There was also testimony that Defendant Johnny "JD" Jarrell was President of the Detroit Chapter and Defendant Robert "Kwik" Flowers was President of the West Side Chapter.  (Trial Tr. Vol. 7, Peters at 92-94; Trial Tr. Vol. 9, Sanchez at 116-118; Trial Tr. Vol. 5, B. Burton at 32-34; Trial Tr. Vol. 9, L. Fitzner at 9.)

Although not a national club, the HMC has chapters in Kentucky, Tennessee, Florida, Michigan, and Indiana.  At one time, it also had an Alabama chapter.  In Michigan, chapters were located in Detroit (four chapters), the Downriver area, Washtenaw County, Monroe, and Lansing.  Chapter officers include a president, vice president, treasurer, master sergeant at arms, sergeant at arms, and general members.  The vice president takes over the duties of the president in his absence.  The treasurer conducts roll call at HMC meetings, records member dues, and handles all chapter finances.  The secretary takes notes during HMC meetings.  The secretary and treasurer positions are often held by the same person.  The sergeant at arms or master sergeant is responsible for collecting past dues from delinquent members, protecting the chapter president, and acting as an enforcer by carrying out all the president's orders.  (Trial Tr. Vol. 3, D. Burnett at 83-90.)  Numerous witnesses testified that the chapter president decides the punishment, and the master sergeant carries it out in the back room.  For example, William Bridges testified about an incident where a young man was being thrown out of the HMC, was taken into the clubhouse back room, and was beaten.  HMC members held him down and tattooed a big

3

black mark over the HMC tattoo on the young man's arm.  (Trial Tr. Vol. 6, W. Bridges at 33-34.)

Each chapter has a clubhouse which is used for a variety of purposes like holding meetings, parties, and other events.  Each chapter has weekly, mandatory meetings that all members are required to attend, and a member is fined if he fails to do so.  Regular "bosses" meetings are also scheduled and attended by the national president, chapter presidents, and "committee" members.

Membership in the HMC is limited to males and is the result of a controlled selection process initiated when an individual becomes an associate or "probie."  After completion of a probation period, the new member then obtains "patched" member status.  Patched and probated HMC members are required to attend special events referred to as "runs." Examples of "runs" include funerals for HMC members, the annual Daytona Bike Week, Biketoberfest, and the Sturgis, South Dakota motorcycle rally.  Failure to attend a mandatory "run" can subject a member to disciplinary action.

Members are expected to abide by a written HMC constitution and by-laws.  Violations may result in fines, expulsion, another probationary period, or physical violence.  Several HMC witnesses testified that, although the HMC constitution had rules on no guns or drugs in the clubhouse and no police as members, these rules were ignored.  There were police officer members, and there were guns and drugs in the clubhouses.

There was ample testimony that no HMC officer ever tried to stop the common occurrence of drug activity in the HMC clubhouses.  (Trial Tr. Vol. 9, Fitzner at 15-16, 26-27; Trial Tr. Vol. 7, C. Miller at 37-40; Trial Tr. Vol. 5, B. Burton at 30-31, 42-46; Trial Tr. Vol. 7, G. Peters at 90-92, 96-98, 99-102.)  Lou Fitzner testified that he joined the HMC

4

because he saw it as a business opportunity that allowed him access to connections for drugs.  (Trial Tr. Vol. 9, Fitzner at 4-5, 27.)  Nat Sanchez also testified that he joined the HMC to make some money by selling cocaine to members.  (Trial Tr. Vol. 9, N. Sanchez at 34, 119-124.) Gerald Peters, William Bridges, and Doug Burnett testified that they used some of their drug sales profits to pay their HMC dues.  (Trial Tr. Vol. 7, G. Peters at 86; Trial Tr. Vol. 6, W. Bridges at 36; Trial Tr. Vol. 3, D. Burnett at 70-71, 82; Trial Tr. Vol. 4, D. Burnett at 22.)  Doug Burnett also testified that there was no need to give kickbacks to past or present HMC officers inside the Club because they used the power of their leadership positions to get free cocaine from members who dealt that drug.  (Trial Tr. Vol. 4, D. Burnett at 22-23, 26-27, 29-30, 73, 79-80.)

Members wear "colors" or leather vests or jackets with the HMC emblem on the back. The colors may display other symbols.  These include "MC" for motorcycle club, "HFFH" for "Highwaymen Forever, Forever Highwaymen," and lightening rod patches, which are awarded to members who perform a violent act either on behalf of the HMC or at the request of HMC leaders.  (Trial Tr. Vol. 5, B. Burton at 19-20; Trial Tr. Vol. 3, D. Burnett at 93-96; Trial Tr. Vo. 10, P. McDonald at 126-127.)

Under the HMC's organizational structure, the national president supervises all chapters, and the president of the Detroit chapter holds the position of second in command. According to witnesses, Anthony Clark was the first national president, followed by Gerald Peters, and then Joseph Whiting.  (Trial Tr. Vol. 10, P. McDonald at 127-128; Trial Tr. Vol. 7, G. Peters at 85-86; Trial Tr. Vol. 5, B. Burton at 26.)  All other chapter presidents report to the Detroit president. Numerous witnesses also testified that, despite leadership titles held by others, Leonard "Dad" Moore, who was known as the HMC "godfather," had the top

5

position of power and controlled the HMC from behind the scenes. Dad Moore painted his name in gold on his colors — everyone else wears their name in silver. Dad Moore has been a long time member of the HMC, was involved in all critical decisions, and is recognized by members as HMC's true leader. (Trial Tr. Vol. 10, P. McDonald at 142; Trial Tr. Vol. 3, D. Burnett at 85-87; Trial Tr. Vol. 9, L. Fitzner at 10; Trial Tr. Vol. 7, G. Peters at 82-83, 85; Trial Tr. Vol. 5, B. Burton 27-28.) For example, Gerald Peters testified that, when he stepped down as the national president, it was Dad who called and told Peters that Dad was putting Whiting in as national president and that Peters would be president of the East Side chapter. (Trial Tr. Vol. 7, G. Peters at 87-88.)

Almost every cooperating witness explained that the HMC had set up a "committee" to oversee the activities of and make decisions for the HMC, including discipline of members. The decision to shut down the West Side Chapter came from the committee and National President Joe Whiting. (Trial Tr. Vol. 9, L. Fitzner at 32.) Some members of the "committee" included: the godfather Dad Moore, the national president Joseph Whiting, all the chapter presidents, Michael Cicchetti, and other older honoraries – past officers and long-time members voted in by HMC members. (Trial Tr. Vol. 9, L. Fitzner at 13-14, 18-19; Trial Tr. Vol. 7, G. Peters at 89; Trial Tr. Vol. 5, B. Burton at 27.) Although committee members changed, Dad Moore always ran the committee. (Trial Tr. Vol. 9, L. Fitzner at 10; Trial Tr. Vol. 5, B. Burton at 27-28.)

There was also ample evidence at trial of HMC-associated criminal activity, including acts of violence like arson, assault, and robbery as well as theft, drug trafficking, and weapons offenses. The criminal element of the HMC, identified here as the HMC enterprise or HMC, used violence to discipline and punish its members. (Trial Tr. Vol. 3,

6

D. Burnett at 84-90; Trial Tr. Vol. 6, W. Bridges at 33-34.)  It also used violence to establish street credibility and to enforce its dominance in a territory over rival biker clubs like the Broad Jumpers, the Black Pistons, and the Outlaws by directing members to attack those rival gangs.  For example, Phil McDonald testified that then-National President Gerald Peters ordered him and others to go to the Broad Jumpers clubhouse and take down their sign.  Peters gave McDonald a pistol and told him to shoot anyone who came out the door while they were taking down the Broad Jumpers sign.  Peters also gave a gun to another HMC member, Chewy, and told him to shoot McDonald if he did not obey Peters's orders. (Trial Tr. Vol. 10, McDonald at 125-126.)

The HMC enterprise also used violence to teach others that no one messes with its members and gets away with it.  The Deese and Guzman incidents are examples of this. There was trial evidence that the HMC planned violence against those members perceived to have "squealed" or to be "snitches."  Witnesses testified that, because of their reputation for violence, an HMC member was more likely to get away with a crime due to the victim's fear of retaliation if the crime was reported.  This is evident in the Deese and Kirchoff incidents.  HMC members are fully aware of and actively cultivate this fear of retaliation and retribution.  Use of violence in this manner improves or enhances an HMC member's standing and reputation.  Witnesses testified that HMC members always travel in large groups and go to bars in large numbers to reenforce the message that you don't mess with the HMC.

There was ample evidence at trial that HMC enterprise members engaged in criminal activity like stealing (e.g., motorcycles) and drug dealing and used the proceeds of their criminal activity both to enrich themselves and to pay for their HMC dues and other club

activities.  Lou Fitzner and Nat Sanchez both testified that they saw membership as a business opportunity and joined the HMC to gain access to its members; Fitzner sought a connection for drugs and Sanchez sought an opportunity to make money by selling cocaine to HMC members.  (Trial Tr. Vol. 9, Fitzner at 4-5, 27; Trial Tr. Vol. 9, N. Sanchez at 112-113, 119-123.)  There was ample evidence about open drug use and drug distributing/sharing in the HMC clubhouses.  Members also provided protection for those who engaged in illegal activities, i.e., witness intimidation (Gov't wiretaps of phone call between Bo Moore and Nagi where Bo Moore tells Nagi not to worry about Kirchoff after the Wheat & Rye bar incident).

## II.   Analysis

At the end of the government's case-in-chief, Defendants moved for a directed verdict of not guilty.  Those motions were denied, and the trial continued to a jury verdict of guilt as to all Defendants.  Defendants have now filed post-trial motions for acquittal or a new trial brought pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure.

### A.   Standard of Review

#### 1.   Rule 29 Motions for Acquittal

"Evidence is sufficient to sustain a conviction if after viewing the evidence in the light most favorable to the prosecution, *and after giving the government the benefit of all inferences that could reasonably be drawn from the testimony*, any rational trier of fact could find the elements of the crime beyond a reasonable doubt."  *United States v. Driver*, 535 F.3d 424, 428-29 (6th Cir.) (internal quotation marks and citations omitted, emphasis in original), *cert. denied*, 129 S. Ct. 662 (2008).  "In examining claims of insufficient

8

evidence, this court does not weigh the evidence presented, consider the credibility of witnesses, or substitute [its] judgment for that of the jury." *Id.* (internal quotation marks and citation omitted).

### 2. Rule 33 Motions for New Trial

As the Sixth Circuit recently observed, "[a] motion for a new trial under Rule 33 is premised on the argument that the jury's verdict was against the manifest weight of the evidence." *United States v. Montgomery*, 358 F. App'x 622, 628 (6th Cir. 2009) (citing *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007)), *cert. denied*, 130 S. Ct. 2122 (2010). "In considering the weight of the evidence for purposes of adjudicating a motion for a new trial, the district judge may act as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence." *Id.* "Generally, such motions are granted only in the extraordinary circumstances where the evidence preponderates heavily against the verdict." *Id.* (internal quotation marks and citations omitted).

### B. Defendants' Motions

Each Defendant challenges the sufficiency of the evidence of their convictions under Federal Rule of Criminal Procedure 29. Defendant Sean Donovan's challenge has two steps and invokes both Rule 29 and Rule 33. Specifically, he argues that a new trial should be granted under Rule 33 based on the erroneous admission of hearsay and irrelevant evidence; and then argues, under Rule 29, that he should be acquitted because, absent that hearsay evidence, there is insufficient evidence to support his Count 17 conviction. The Court now addresses Defendants' individual arguments.

### 1. Johnny "JD" Jarrell

9

Defendant Johnny "JD" Jarrell was convicted on the RICO conspiracy count (Count 2 of the Second Superseding Indictment) and the Nagi drug conspiracy count (Count 19). His motion challenges the sufficiency of the evidence on both convictions and is thus analyzed under Rule 29.[1]  Jarrell's conviction on Count 2 is addressed first.

### a.  Sufficiency of Evidence on RICO Conspiracy Conviction

As to his Count 2 RICO conspiracy conviction, Defendant Jarrell argues that there is insufficient evidence to prove that he agreed that someone would commit two of the Racketeering Acts alleged in Count 1 of the Indictment.  This Court disagrees.

First, as an initial matter, the Court rejects Jarrell's argument that the government's dismissal of Count 1, alleging that Jarrell's involvement in Racketeering Acts 11 (the Nagi drug conspiracy) and 8 (Myrtle Beach), compels the conclusion that no reasonable jury could convict Jarrell on the RICO conspiracy charge (Count 2).  *See United States v. Russo*, 796 F.2d 1443, 1462 (11th Cir. 1986) (holding that "the jury could have found that [the defendant] agreed to participate in the enterprise through the commission of two predicate acts without finding that he actually committed the two predicate acts.").

The Court also rejects Defendant Jarrell's related argument that his due process rights were violated because the special verdict form did not require the jury to specify which two of the Racketeering Acts identified in Count 1 and incorporated into Count 2 were "committed by" Defendant Jarrell "in the conduct of the affairs of the enterprise."  (Def. Jarrell's Supp. Br. at 1.)  The decision Defendant relies on refutes, rather than supports,

---

[1]Applying the appropriate standard, this Court rejects Defendant's alternative Rule 33 argument for a new trial and finds that the jury's verdict was not against the manifest weight of the evidence.

10

the argument he makes.  "To prove a RICO conspiracy charge, it is not necessary to show that the defendant committed two predicate acts himself or agreed to commit two predicate acts himself."  *Driver*, 535 F.3d at 432.  Rather, a "RICO conspiracy conviction can be sustained if there is evidence sufficient to prove that [the defendant] agreed that *someone* would commit two predicate acts."  *Id.*  As shown below, there was sufficient trial evidence to prove that Defendant Jarrell agreed that *someone* would commit two predicate acts.

Second, despite Jarrell's arguments to the contrary, there is sufficient evidence connecting him to the drug conspiracy alleged in Racketeering Act 11 – the Nagi drug conspiracy[2] – as well as several other Racketeering Acts identified in Count 1.

As to Racketeering Act 11, the evidence is sufficient to show that the drug trafficking activity alleged in Racketeering Act 11 was related to and an integral part of the HMC enterprise and its activities.[3]  Likewise, the evidence is sufficient to prove that Jarrell agreed

_____

[2]Racketeering Act Eleven (Conspiracy to Distribute Controlled Substances) alleges that:

> From in or about 2004 through the date of this indictment, in the Eastern District of Michigan, Leonard "Bo" Moore, Johnny Jarrell, Robert Flowers, and others known and unknown to the grand jury, did knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree with each other to commit offenses against the United States, that is, to distribute more than five kilograms of cocaine, as well as marijuana, Vicoden, Viagra, Ecstacy, and other controlled substances; in violation of Title 21, United States Code, Sections 841(a)(1), and 846.

Second Superseding Indictment, Count One.

[3]To the extent Defendants argue that there was insufficient proof to establish a RICO enterprise, that argument is rejected.  There was substantial evidence submitted at trial establishing this element of the RICO charges.  Moreover, as the Court instructed the jury, it is not illegal in and of itself to be a member or associate of the HMC.  Nonetheless, there

that someone would commit the predicate act described in Racketeering Act 11. The evidence shows that, after about five years of becoming a member of the HMC, Defendant Jarrell became President of the Detroit or "Mother" Chapter in February 2005 – a leadership position second only to the National President. (Gov't Ex. 205-O; Trial Tr. Vol. 7, C. Miller at 34-35; Trial Tr. Vol. 7, G. Peters at 91-92; Trial Tr. Vol. 9, N. Sanchez at 116-117.) Ample trial evidence exists showing that members of the HMC sold to or distributed/shared drugs with other members. The record is replete with testimony about HMC members sharing cocaine (e.g., references to "Scooby Snacks" or "Meals"). There is also abundant evidence that the HMC condoned drug trafficking and drug use despite language to the contrary in its constitution. For example, Chris Miller testified that he saw Defendant Jarrell smoking marijuana inside the HMC clubhouse while standing by the bar and conversing with other HMC members. (Trial Tr. Vol. 7, C. Miller at 37-38.) It was a common occurrence to have drug deals and drug use at the HMC clubhouses. The HMC leaders did not stop it. Rather, they freely shared the cocaine distributed inside the clubhouses. *See United States v. Clark*, 634 F.3d 874, 877 (6th Cir. 2011) (observing that the Sixth Circuit has "held that an individual who shares drugs with a friend possesses the intent to distribute."). There was also evidence that HMC members used each other for protection, to collect drug debts, and to assault people who they believed "stiffed" them on drug deals.

──────────────

was sufficient evidence at trial establishing that a large number of the Detroit area HMC members had associated together and formed an on-going organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the enterprise. In short, the evidence showed that the enterprise was a criminal organization that evolved out of the HMC; it was not the HMC.

As to Defendant Jarrell specifically, Gerald Peters testified that, although he did not see Jarrell distribute illegal narcotics, he heard him talking about how he and Nagi went in on some "stuff" that came from Arizona.  Peters assumed it was marijuana.  (Trial Tr. Vol. 7, G. Peters at 91-93.)  Peters' testimony is corroborated by Doug Burnett's testimony.

Doug Burnett testified that Jarrell and Bo Moore were two of the "crew" who were involved in Nagi's drug business and dealt mostly with marijuana.  He had conversations with Nagi about his drug activity and was present when Nagi had conversations with others about his drug business.  He saw Jarrell and others conducting drug business with Nagi.  Burnett also testified that on one particular occasion JD, Bo Moore, and another member of Nagi's "crew," went out to collect money owed for drugs.  (Trial Tr. Vol. 3, Burnett at 108-112.)

Lou Fitzner also testified that he knew that Nagi and Jarrell were dealing with each other and was present when the two discussed drug activity.  Fitzner was also dealing drugs with Nagi.  He testified that on one occasion he picked up approximately 20 pounds of marijuana that he had purchased from Nagi at Jarrell's home.  (Trial Tr. Vol. 9, L. Fitzner at 28-31, 81-85.)  There are also multiple wire-tapped phone conversations between Jarrell and Nagi discussing drug transactions.  For example, there is a wire-tapped call between Jarrell and Nagi where Jarrell tells Nagi that he wants to get back some of the 100 Viagra pills that Nagi gave to Jeff Olko at the Walkabout Cycle, Eight Mile Chopper shop, and Nagi promises Jarrell that he'll get him 100 Viagra pills so he can keep some and sell some.  (Gov't Ex. 68.)  Special Agent Brzezinski testified that, two weeks after that call, the state police executed a search warrant for that shop and recovered 78 pills of Viagra and marijuana.

13

Former HMC President, Phil McDonald also testified that he knew that Jarrell and Nagi were good friends and had heard that Nagi moved large quantities of marijuana. So, when he got information from a police officer that the FBI was wire-tapping phone conversations of HMC members and focusing on members that were dealing large amounts of marijuana, McDonald called Jarrell to warn him. He did not call Nagi because he assumed that Nagi's phones were tapped. (Trial Tr. Vol. 10, McDonald at 147-150.)

From this evidence, it can be inferred that Jarrell had entered into an agreement with others to violate RICO by conspiring to distribute controlled substances (Racketeering Act 11). *See United States v. Lawson*, 535 F.3d 434, 445 (6th Cir. 2008) (observing, under similar circumstances, that even absent direct evidence, an "agreement [to violate RICO] can be inferred from [the defendant's] acts."). As the Sixth Circuit recently observed in *Driver*, "[p]roof of a formal agreement is not required to establish a conspiracy; a tacit or material understanding among the parties is sufficient." *Driver*, 535 F.3d at 429 (internal quotation marks and citations omitted).

The Court also rejects Defendant Jarrell's argument that there was insufficient evidence that Jarrell agreed that someone would commit at least one other Racketeering Act, e.g., Racketeering Act 8 – the transport and receipt of stolen motorcycles from Myrtle Beach, South Carolina.[4] There is ample evidence that Jarrell was in Myrtle Beach during

---

[4]Racketeering Act Eight (Transporting and Receiving Stolen Vehicles) alleges that:

The defendants committed the following acts, either one of which alone constitutes Racketeering Act Eight.

A. Transporting Stolen Vehicles

In or about March 2006 through in or about October 2006, in the Eastern

bike week with other HMC members, including Defendants Bo Moore and Flowers, when motorcycles were stolen. A wire-tapped conversation between Whiting and McDonald places Jarrell there. (Gov't Ex. 153.) He stayed in a condo with Defendant Bo Moore, right around the corner from Bobby Burton. Burton testified that he got a motorcycle that HMC members stole during that bike week run in Myrtle Beach; that Bo Moore and another HMC member Gary Ball, Jr. stole bikes; that the stolen green motorcycle was stored for a while at the condo shared by Defendants Bo Moore and Jarrell until Bo Moore told Burton to move it; and that Burton rented a U-haul truck for other HMC members who transported the stolen bikes back to the Detroit area. (Trial Tr. Vol. 5, B. Burton at 62-67; Trial Tr. Vol. 11, P. McDonald at 15-20.) The government also introduced evidence that a stolen motorcycle was subsequently recovered from Jarrell's home.

There was also evidence that Jarrell frequently conspired with other HMC members to steal motorcycles. Doug Burnett testified that Jarrell was the leader of a click of HMC members that stole motorcycles – they would drive around to places like bars and if they

---

District of Michigan and elsewhere, Leonard "Bo" Moore, and others known and unknown to the grand jury, did knowingly, intentionally, and unlawfully transport, in interstate commerce, motorcycles from the State of South Carolina to the State of Michigan, knowing the same to be stolen; in violation of Title 18, United States Code, Section 2312 and 2.

B. Receiving Stolen Vehicles

In or about March 2006 through in or about May 2006, in the Eastern District of Michigan and elsewhere, HMC members and associates did knowingly, intentionally, and unlawfully receive, possess, and store, in the State of Michigan, motorcycles stolen from the State of South Carolina, knowing the same to be stolen; in violation of Title 18, United States Code, Sections 2313 and 2.

Second Superseding Indictment, Count One.

15

spotted a unlocked motorcycle, Jarrell's "crew" would steal the bike.  Some of the stolen

bikes were sold or given away; others were broken down and their parts either sold or used

to build an assembled bike that was made to look as if it were not stolen.  (Trial Tr. Vol. 3,

D. Burnett at 72-76.)

This evidence is sufficient to allow a reasonable jury to infer that Jarrell agreed that

Bo Moore or Bobby Burton or others would commit the predicate act of transporting and

receiving motorcycles that were stolen during bike week in Myrtle Beach, South Carolina

(Racketeering Act 8).

### b.  Sufficiency of Evidence for Count 19 Conviction

Defendant Jarrell also argues that the government failed to introduce sufficient

evidence on his Count 19 conviction for conspiracy to possess with intent to distribute and

distribution of controlled substances (the Nagi drug conspiracy).[5]  The Court disagrees.

As discussed above in connection with Racketeering Act 11, there is sufficient

evidence that Jarrell and Nagi had more than a mere buyer/seller relationship.  Likewise,

there is sufficient evidence to support the jury's finding of guilt on Count 19.  *See United

States v. Gardner*, 488 F.3d 700, 711 (6th Cir. 2007) (addressing sufficiency of evidence

---

[5]Count 19 of the Indictment alleges that:

   In or about 2004 through the date of this indictment, in the Eastern District
of Michigan, Leonard "Bo" Moore, Johnny Jarrell, Robert Flowers, and others
known and unknown to the grand jury, did knowingly, intentionally, and
unlawfully combine, conspire, confederate, and agree to commit offenses
against the United States, that is, to possess with intent to distribute, and to
distribute, controlled substances; in violation of Title 21, United States Code,
Section 846.

Second Superseding Indictment, Count Nineteen.

16

for jury finding of guilt on violation of 21 U.S.C. § 846).  The elements of a drug conspiracy under § 846 include:  "(1) an agreement to violate drug laws; (2) knowledge of and intent to join the conspiracy; and (3) participation in the conspiracy."  *Id.* at 710.  "These elements can be shown by either direct or circumstantial evidence."  *Id.*

As to the first element, "the government need not prove the existence of a formal or express agreement among the conspirators. . . .  Even a tacit or mutual understanding among the conspirators is sufficient."  *Id.*  As to the second element, "the government must show the willful membership of the defendant in the conspiracy, but the government need not prove that the defendant committed an overt act in furtherance of the conspiracy."  *Id.* at 711.  Moreover, "while the connection between the defendant and the conspiracy need only be slight, mere association with conspirators is not enough to establish participation."  *Id.*  Finally, as to the third element, "knowledge of and participation in the common purpose and plan of a conspiracy may be inferred from the defendant's actions and reactions to the circumstances."  *Id.*

Applying Rule 29 and evaluating the evidence introduced at trial in the light most favorable to the government, the trial evidence shows far more than Jarrell's mere association with conspirators.  Contrary to Defendant's arguments here, there is sufficient evidence that Jarrell willfully participated in the Nagi drug conspiracy alleged in Count 19 of the Indictment.

### 2.  Robert Flowers

Similar to Defendant Jarrell, Defendant Robert "Kwik" Flowers was convicted on the RICO conspiracy count (Count 2) and the Nagi drug conspiracy count (Count 19) of the Indictment.  (12/08/10 Verdict Form, Doc. No. 1676.)  His motion challenges the sufficiency

17

of the evidence on both convictions and is thus analyzed under Rule 29.[6]  The Court will first examine the sufficiency of evidence on the RICO conspiracy count (Count 2).

### a.  Sufficiency of Evidence on RICO Conspiracy Conviction

Similar to Defendant Jarrell, Defendant Flowers argues that there is insufficient evidence to prove that he agreed that someone would commit two of the Racketeering Acts alleged in Count 1 of the Indictment.  This Court disagrees.

First, despite Flowers' arguments to the contrary, the evidence discussed above is sufficient to show that the drug trafficking activity alleged in Racketeering Acts 9[7] and 11 were related to and an integral part of the HMC enterprise and its activities.  Likewise, there is sufficient evidence to tie Flowers to the drug conspiracies alleged in Racketeering Acts 9 and 11 – the Burton and Nagi drug conspiracies.

Defendant Flowers was a long-time member of the HMC (from 1999 to around 2008).  He was a member of the Detroit or "Mother" Chapter, and then President of the West Side Chapter.  Gerald Peters testified that Flowers had his lightening rods already by the time

---

[6]Applying the appropriate standard, this Court rejects Defendant's alternative Rule 33 argument for a new trial and finds that the jury's verdict was not against the manifest weight of the evidence.

[7]Racketeering Act Nine (Conspiracy to Distribute Cocaine) alleges that:

In or about 2000 through in or about 2007, in the Eastern District of Michigan Sean Donovan, and others known and unknown to the grand jury, did knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree with each other to commit an offense against the United States, that is, to distribute more than five kilograms of cocaine, a Schedule II controlled substance; in violation of Title 21, United States Code, Section 846.

Second Superseding Indictment, Count One.

Peters became a member.  (Trial Tr. Vol. 7, G. Peters at 94, 136, 139; Trial Tr. Vol. 5, B. Burton at 33-34, 72.)

There was also ample trial evidence of Burton's drug dealing in cocaine and Nagi's drug dealing in controlled substances like marijuana, cocaine, and pills like Viagra.  More specific to this Defendant, Gerald Peters testified that, during the period of time alleged in Racketeering Act 9, Bobby Burton told him that Flowers had recently delivered to him a kilo of cocaine that Flowers had gotten from one of his friends.  Burton was not pleased when he discovered that the middle of the kilo was rerock or homemade cocaine.  Burton believed that Flowers taught his friend how to rerock and wanted Flowers to replace the rerocked part of the kilo.  (Trial Tr. Vol. 7, G. Peters at 96-97.)  On another occasion, Peters saw Flowers sell a kilo of cocaine to Burton.  Peters recalled the sale because it occurred at his home in Detroit when he was present with Burton and Flowers.  (Trial Tr. Vol. 7, G. Peters at 127.)

Lou Fitzner, who joined and later became a master sergeant and vice president of the HMC West Side Chapter, testified that Defendant Flowers was the President and Nagi the Vice President of that Chapter.  (Trial Tr. Vol. 9, Fitzner 9-11.)  Fitzner also testified that, in addition to himself, Defendant Flowers, Bobby Burton and Nagi were all dealing drugs while they were members of the West Side Chapter, and that the "no drugs in the clubhouse" rule was never followed.  (Trial Tr. Vol. 9, Fitzner at 24.)  Fitzner dealt marijuana.  He would buy anywhere from 5 to 20 pounds from Nagi.  Nagi was also dealing quarters, halves and kilos of cocaine and pills like Viagra and Vicodin.  (*Id.* at 24-25.)  As to Defendant Flowers's drug dealing, Fitzner testified that Flowers dealt anywhere from 1 to 10 pounds of marijuana and cocaine in the clubhouse.  Fitzner explained that he began

19

buying marijuana from Defendant Flowers when he joined the West Side Chapter for a period of time until he discovered that Flowers was getting his marijuana from Nagi.  From that point on, Fitzner brought from Nagi, cutting the middleman Flowers out.  (Trial Tr. Vol. 9, Fitzner at 27-28, 63-66.)

Chris Miller also testified that, while hanging around Defendant Flowers's house, he saw marijuana and Ecstasy, but never saw Flowers sell any.  (Trial Tr. Vol. 7, C. Miller at 33-35.)  Nat Sanchez testified that he joined the HMC to make money by selling cocaine to HMC members; that before joining, Defendant Flowers introduced him to Nagi as the vice president of the West Side Chapter; and further testified that, after becoming a member, he sold cocaine to HMC members and gave the HMC leaders cocaine for free while in the HMC clubhouses so he could prosper in the HMC.  (Trial Tr. Vol. 9, N. Sanchez at 112, 119-124.)

Applying the Rule 29 standard, there is sufficient evidence to show that Flowers conspired with Bobby Burton and others to distribute cocaine – the predicate act alleged in Racketeering Act 9 – and conspired with Nagi and others to distribute marijuana – the predicate act alleged in Racketeering Act 11.  From this, it can be inferred that Flowers agreed that someone would commit two of the alleged predicate acts.  *See Driver*, 535 F.3d at 432.

### b.  Sufficiency of Evidence on Count 19

Flowers concedes that his argument is weakest as to Count 19 – the Nagi drug conspiracy  – and it is.  (Flowers Mot. at 2 n.1.)  Applying Rule 29 and evaluating the evidence introduced at trial in the light most favorable to the government, the trial evidence shows far more than Defendant Flowers's mere association with conspirators.  There is

20

sufficient evidence that Flowers willfully participated in the Nagi drug conspiracy alleged in Count 19 of the Indictment.

### 3. Sean "Bones" Donovan

Defendant Sean Donovan was convicted on the Burton drug conspiracy count (Count 17) of the Indictment.[8]  (12/08/10 Verdict Form, Doc. No. 1676.)  His motion first argues that a new trial should be granted under Rule 33 based on the erroneous admission of hearsay and irrelevant evidence; and next argues, under Rule 29, that Defendant Donovan should be acquitted because, absent that hearsay evidence, there is insufficient evidence to support his Count 17 conviction.  This Court disagrees.

At trial, Bobby Burton identified Defendant Sean Donovan as being a member of the HMC since around 1999.  Donovan went by the club nickname of "Bones" and did not appear to have a legitimate job from 2000 through 2006.  During that time frame, Burton was also a member of the HMC, did not have a legitimate job, and made between $2,000 and $3,000 a week from selling cocaine.  (Trial Tr. Vol. 5, B. Burton at 32-35.)  Burton testified that he distributed cocaine to HMC members and also bought cocaine from members of the HMC that he then resold.  He specifically identified Defendant Donovan as one of the HMC members from whom he bought cocaine.

---

[8]Count 17 of the Indictment alleges that:

> In or about 2000 through in or about 2007, in the Eastern District of Michigan, Sean Donovan, and others known and unknown to the grand jury, did knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree to commit an offense against the United States, that is, to distribute over five kilograms of cocaine, a Schedule II controlled substance; in violation of Title 21, United States Code, Section 846.

Burton testified that Donovan would front him a couple of ounces of cocaine at a time. He estimated that he probably got cocaine from Donovan about 20 times and that the total probably amounted to a half a kilo. (Trial Tr. Vol. 5, B. Burton at 38-40, 116-117.) Burton also testified that he called Defendant Donovan to help him come up with and carry out a plan to recover $18,000 that Burton gave to another cocaine supplier, Ruben Guzman, for a kilo of cocaine after Guzman took off with Burton's money without giving him the cocaine. (*Id.* at 58-61.)

Gerald Peters, another co-conspirator and HMC member, also identified Defendant Donovan by his HMC nickname "Bones" and testified that he knew Donovan when Donovan was an HMC member. (Trial Tr. Vol. 7, G. Peters at 92-93.) Peters also testified that, in addition to distributing cocaine in the HMC clubhouse, he sold cocaine to HMC members, including Cicchetti and National President Joe Whiting. (*Id.* at 96-98.) Peters got his cocaine from HMC members Bobby Burton, Darrell Bryant, and Gary Ball, Jr. (*Id.* at 95.) Other HMC members were also getting cocaine from Bobby Burton, including Doug Burnett and John McGinn – known in the HMC as "Crete." (*Id.* at 95, 98.) Bobby Burton's testimony corroborates that of Peters regarding McGinn. Burton testified that he distributed cocaine to McGinn so that McGinn could resell it. (Trial Tr. Vol. 5, B. Burton at 40-41.) Gerald Peters testified that he had conversations with John McGinn about the cocaine distribution business, e.g., how much people were paying for it; and in one of those conversations, co-conspirator McGinn told Peters that he was getting cocaine from Defendant Sean Donovan in nine-ounce amounts. (Trial Tr. Vol. 7, G. Peters at 98-99, 132-134.) This evidence is sufficient to connect Defendant Donovan to the Burton drug conspiracy, i.e., Burton and McGinn bought from Donovan and Burton also sold to McGinn.

22

Another HMC member and co-conspirator, William Bridges, also testified at trial about Defendant Donovan's drug dealing.  Bridges testified that he joined the HMC in 2001 after meeting Bobby Burton and began buying cocaine from him.  Bridges bought between one to three ounces from Burton about 75 times at $1,000 an ounce.  (Trial Tr. Vol. 6, W. Bridges at 25-28, 41.)  Bridges knew Defendant Donovan through membership in the HMC. He described a drug transaction that occurred between 2001 and 2006 that involved Defendant Donovan.  Bridges testified that he bought a couple of ounces of cocaine through HMC member Cicchetti.  Bridges wanted to buy a quantity of cocaine, but Burton was out of cocaine at the time.  So, Bridges asked Cicchetti who told him he could get it for him.  Cicchetti told Bridges that he purchased cocaine from Defendant Donovan.  Cicchetti took Bridges over Defendant Donovan's home and both Cicchetti and Bridges went inside. Donovan and Cicchetti left the room; and when they came back, Cicchetti had the cocaine. Although Bridges did not see Donovan give Cicchetti the cocaine, Cicchetti had cocaine after he met with Donovan and gave Bridges a couple of ounces of cocaine after leaving Donovan's home.  (*Id.* at 30-32, 44-47.)

All of this testimony is in addition to that from co-conspirators describing how cocaine use and distribution was common within the HMC clubhouses and that HMC members could get "dope" anywhere in the club.  (Trial Tr. Vol. 3, D. Burnett at 66-67; Trial Tr. Vol. 7, C. Miller at 46; Trial Tr. Vol. 10, P. McDonald at 140-141; Trial Tr. Vol. 9, L. Fitzner at 16, 26.)  The above testimony was sufficient to show that Donovan and Bobby Burton had more than a mere buyer/seller relationship and is sufficient to support the jury's finding of guilt on Count 17 – the Burton drug conspiracy.

Despite Defendant Donovan's Rule 29 and Rule 33 arguments to the contrary, the

Court did not err when it overruled hearsay objections and found Peters's and Bridges's testimony admissible as co-conspirator statements. The government introduced evidence showing the existence of the Burton drug conspiracy and that the challenged co-conspirator statements were made during the course of and in furtherance of that drug conspiracy. *See* Fed. R. Evid. 801(d)(2)(E). Bobby Burton testified that he purchased cocaine from Defendant Donovan. Burton also testified that he sold large amounts of cocaine to HMC members Bridges and McGinn. Peters testified that McGinn purchased cocaine from Donovan. It is thus reasonable to infer from this testimony that if Burton was out of cocaine, his buyers – Bridges and McGinn – would turn to one of his suppliers – Donovan – to fill the demand. The testimony elicited from Bridges about Cicchetti and Donovan and from Peters about McGinn and Donovan was admissible under the co-conspirator exception to the hearsay rule.

The Court also rejects Defendant Donovan's argument that Bridges's testimony about using Cicchetti to get cocaine from Donovan one time when Burton was out of drugs should have been excluded under Fed. R. Evid. 404(b) and was not relevant to charges brought against Donovan in Count 17. Donovan's relevancy argument fails for two reasons. First, as discussed above, Bridges's testimony was relevant to show Donovan's connection to the Burton drug conspiracy. It also fails because it ignores that Donovan was also charged in Counts 1 and 2, the RICO substantive and conspiracy counts respectively. The challenged testimony elicited from Bridges, as well as that elicited from Peters, was relevant to establish a drug connection between Defendant Donovan and others in the HMC enterprise, to describe some of the drug activities of the HMC enterprise, and to show Donovan's agreement that some member or members of the RICO enterprise would

24

commit one or more of the Racketeering Acts described in Count 1 and incorporated in Count 2 of the Indictment.[9]

### 4. Leonard "Bo" Moore

Defendant Leonard "Bo" Moore was convicted on the substantive RICO and RICO conspiracy counts (Count 1 and 2); the counts associated with the Megdanoff shooting incident, i.e., VICO (Count 9) and use of a firearm during a crime of violence (Count 33); the Nagi drug conspiracy count (Count 19); and the Myrtle Beach stolen motorcycle conspiracy (Count 15). Counts 19 and 15 replicate the Racketeering Acts alleged in Count 1 that the jury attributed to Defendant Bo Moore. In his Rule 29/33 motion, Defendant Bo Moore challenges each of these convictions. Defendant's motion challenges the sufficiency of the evidence on his convictions and is thus analyzed under Rule 29.[10]

### a. Sufficiency of Evidence on Nagi Drug Conspiracy (Count 19 and Racketeering Act 11)

Defendant Bo Moore first argues that there was insufficient evidence to support his conviction on the Nagi drug conspiracy alleged in Count 19 and the jury's specific finding that Racketeering Act 11 identified in the substantive RICO count and incorporated into the

---

[9]For these reasons, the Court also rejects Donovan's Fed. R. Evid. 404(b) argument. The challenged evidence does not fall under Rule 404(b)'s prohibition of "other acts" evidence because it was not introduced for the impermissible purpose of showing that Defendant acted in conformity with his prior bad acts. *See United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000) (acknowledging that the Sixth Circuit previously recognized that "background" evidence, "often referred to as '*res gestae*,' does not implicate Rule 404(b)."). *See also United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995) (holding that "Rule 404(b) does not apply where the challenged evidence is 'inextricably intertwined' with evidence of the crime charged in the indictment.").

[10]Applying the appropriate standard, this Court rejects Defendant's alternative Rule 33 argument for a new trial and finds that the jury's verdict was not against the manifest weight of the evidence.

RICO conspiracy count (Counts 1 and 2) was proven.  Specifically, Bo Moore argues that the trial evidence showed only a buyer/seller relationship between him and Nagi and the sharing of small, personal use amounts of drugs; not a drug conspiracy.  The Court disagrees.

As to the Nagi drug conspiracy, Burton testified that Bo Moore distributed marijuana. (Trial Tr. Vol. 5, B. Burton at 50.)  Doug Burnett testified about Nagi's drug activities and identified Defendant Bo Moore as one of the people that helped Nagi with his drug activities.  Specifically, he recalled one instance where Bo Moore and Johnny Jarrell ("JD") went with Nagi to collect money owed to Nagi for a drug deal.  (Trial Tr. Vol. 3, 1/4/10, D. Burnett at 107-110.)  He explained that Bo Moore, JD, and Nagi were their own tight crew that dealt mostly in marijuana.  (*Id.* at 110-111.)  As discussed above, there is corroborating testimony from other witnesses that JD and Nagi worked together in drug activities.  There is also testimony that Nagi distributed cocaine, marijuana, and Vicodin pills in the HMC clubhouse.  (Trial Tr. Vol. 7, C. Miller at 46.)  Gerald Peters also testified that Defendant Bo Moore shared marijuana with others in the HMC clubhouse – a lot of the guys in the HMC smoked it.  (Trial Tr. Vol. 7, G. Peters at 101-102.)  Wire-tapped phone calls between Nagi and Defendant Bo Moore introduced at trial are further evidence of Bo Moore's agreement to participate in the Nagi drug conspiracy.  (Gov't Ex. 29A, Bo Moore telling Nagi that he had "Scoobs [cocaine];" Gov't Ex. 59A, Nagi telling Bo Moore that he better have some "Scoobs" when they go out; Gov't Ex. 122A, Bo Moore telling Nagi that he's got his "Scoobies" and will bring them to him; Gov't Ex. 127A, Bo Moore tells Nagi that JD called him and told him that Bo owed JD $200 for the "last little bit of chronic [weed]" that Bo kept and was using to roll a joint as they spoke.)

26

This evidence is sufficient to show that there was an agreement to violate drug laws, that Defendant Bo Moore was aware of the object of the Nagi drug conspiracy, and voluntarily associated himself with it to further its objectives.  It is likewise sufficient to show that Nagi and Bo Moore had more than a buyer/seller, personal use relationship. Specifically, evidence was introduced showing that Bo Moore was a part of Nagi's drug crew, marijuana was the primary drug that the Nagi crew sold, and Bo Moore on at least one occasion helped Nagi collect a drug debt.  The wire-tapped calls between Bo Moore/Nagi showed the distribution of Scooby Snacks or smaller amounts of cocaine that was repeated over an extended period of time.  The Sixth Circuit recently affirmed its earlier holding that "an individual who shares drugs with a friend possesses the intent to distribute."  *United States v. Clark*, 634 F.3d at 877 (holding that "the United States introduced sufficient evidence that [the defendant] distributed drugs to others to support the jury's verdict" of guilty on a charge of possession with the intent to distribute a controlled substance because the defendant shared drugs he stole during home robberies).

### b.  Sufficiency of Evidence on Conspiracy to Transport Stolen Vehicles - Myrtle Beach (Count 15 and Racketeering Act 8)

Defendant Bo Moore next argues that there was insufficient evidence to support his conviction on the conspiracy to transport stolen property in interstate commerce alleged in Count 15 (Myrtle Beach) and the jury's specific finding that Racketeering Act 8 identified in the substantive RICO count and incorporated into the RICO conspiracy count (Counts 1 and 2) was proven.  Specifically, Bo Moore questions the credibility of the witnesses who testified about his involvement with stolen motorcycles in Myrtle Beach during bike week and the sufficiency of the evidence tying him to any conspiracy to transport stolen

motorcycles.

Contrary to Defendant's arguments here, there is ample evidence of Bo Moore's involvement with the conspiracy to steal motorcycles during bike week in Myrtle Beach, South Carolina. A wire-tapped conversation between National President Joe Whiting and Phil McDonald places Bo Moore there. (Gov't Ex. 153.) Bobby Burton also testified that he went down to Myrtle Beach for bike week and so did Defendant Bo Moore, JD, Bobby Flowers, Steve Nagi, Junior Ball, and others. While there, Burton was approached by Bo Moore. Bo Moore told him that he had a radio from a motorcycle that he had stolen and Bo Moore was going to give Burton the radio. (Trial Tr. Vol. 5, B. Burton at 62-64.) Bo Moore was staying in a condo in Myrtle Beach right around the corner from Bobby Burton with Jarrell. Burton testified that, during the course of the week, Bo Moore called him and told him that he "got a bike" and another HMC member, "Gone," was bringing it to Burton. It was a custom green chopper worth approximately $25,000. (*Id.* at 65-66.) Later, Defendant Bo Moore called Burton and told him to move the green chopper from Bo's and JD's condo to Burton's condo. (*Id.* at 66.) Burton testified that he got two bikes that were stolen from Myrtle Beach: the green one from Gone and a black and silver one that Defendant Bo Moore dropped off to him. (*Id.* at 70, 124.) Burton eventually sold the green motorcycle to Bridges. (*Id.* at 124.) Bridges's testimony corroborates Burton's, i.e., Bridges testified that he bought a green chopper off Burton, and Burton later told him that the bike came from Myrtle Beach. (Trial Tr. Vol. 6, W. Bridges at 37-38.)

Burton testified that he saw four or five other expensive motorcycles that week that were stolen by HMC members, and identified Defendant Bo Moore and Junior Ball as the ones stealing the bikes. The bikes were stored at friends' condos and in trailers, and some

28

were being stripped down and hidden in the back of trucks.  (Trial Tr. Vol. 5, B. Burton at 66.)  Burton rented a U-Haul truck so the stolen motorcycles could be transported back to Detroit.  Burton testified that he later saw the bikes stolen from Myrtle Beach in Michigan.  (*Id.* at 66-67.)  They were taken to another member's transmission shop.  Nagi got one of the stolen bikes, and the police recovered others from that shop.  (*Id.* at 67-68.)  Burton testified that stealing motorcycles was a common HMC activity and described other incidents where thefts occurred.  (*Id.* at 69.)  He also testified that Bo Moore was known to be a good motorcycle mechanic and had a shop set up in his garage where he had tools to work on motorcycles.  (*Id.* at 83.)

Burton's testimony about motorcycles being stolen from Myrtle Beach and transported to Michigan is corroborated by other HMC members who testified at trial.  For example, Lou Fitzner testified that he helped Junior Ball unload the motorcycles from a U-Haul at HMC member Eugene ("G-No") Trump's shop, and further testified that Ball, Trump, and Nagi told him the bikes were stolen from Myrtle Beach. (Trial Tr. Vol. 9, L. Fitzner at 42-44.)

Phil McDonald testified that he got a call from Nagi when Nagi was on his way back from Myrtle Beach.  Nagi told him that they stole some motorcycles while there.  A short time later, when McDonald was at the Stop-in Lounge with other HMC members, he had a conversation with Defendant Bo Moore.  Bo Moore told McDonald that he sold a lot of the bikes stolen from Myrtle Beach, made some pretty big money, and the rest were either stashed or cut up in parts.  McDonald also testified about another time at the Stop-in Lounge when Junior Ball was too drunk to drive and had to leave his bike at the bar.  The owner, Tony Viramontez, put the bike inside the bar overnight but called McDonald the next morning because he wanted it out.  McDonald was unable to reach Junior Ball so he called

29

Defendant Bo Moore to see if he could help locate Junior Ball.  McDonald went to the bar and helped Tony get the bike out of his bar.  When he talked to Defendant Bo Moore, Bo told McDonald not to put the bike out front because it was either stolen or retagged and he was worried about the police finding it.  (Trial Tr. Vol. 11, P. McDonald at 15-20.)

Gerald Peters also testified that Defendant Bo Moore told him that they had stolen a lot of bikes from Myrtle Beach in May 2006, that they brought them back in a U-Haul, but did not identify who "they" were.  Bo Moore also told him that Bobby Burton and Junior Ball were fighting over the stolen bikes.  (Trial Tr. Vol. 7, G. Peters at 110-112, 118-119.)

Contrary to Defendant Bo Moore's arguments here, there is ample trial evidence to support his conviction on Count 15 and the jury's finding that Racketeering Act 8 was proven.  This evidence is sufficient to show the existence of a conspiracy to transport stolen motorcycles from Myrtle Beach, South Carolina to Michigan, that Defendant Bo Moore was aware of the conspiracy, and that Bo Moore was a willing participant in that conspiracy.

### (c) Sufficiency of Evidence on Substantive RICO and RICO Conspiracy Convictions (Counts 1 and 2)

#### (1)    Substantive RICO Conviction - Count One

As to Defendant Bo Moore's conviction on the substantive RICO count (Count 1), he argues that there was insufficient evidence that he knowingly carried out the decisions of the HMC enterprise or adopted the goal of furthering or facilitating the criminal endeavors of the HMC enterprise.  Defendant further argues that the evidence at trial was insufficient to show that the criminal activity alleged in Racketeering Acts 8 and 11 was related to and an integral part of the HMC enterprise and its activities.  This Court disagrees.

"A substantive RICO charge requires the Government to prove:  (1) the existence of

an enterprise which affects interstate or foreign commerce; (2) the defendant's association with the enterprise; (3) the defendant's participation in the conduct of the enterprise's affairs; and (4) that the participation was through a pattern of racketeering activity." *United States v. Fowler*, 535 F.3d 408, 418 (6th Cir.), *cert. denied*, 129 S. Ct. 661 (2008). Defendant Bo Moore challenges the sufficiency of the government's evidence on all but the first element.

As discussed above, there was sufficient trial evidence on the second element. As to the third element, Defendant Bo Moore's participation in the conduct of the HMC enterprise's affairs, he argues there was a lack of evidence that he was even a member of the HMC or that he had some part in directing the enterprise's affairs. (Def.'s Mot. at 11.) These arguments lack merit.

As an initial matter, despite Defendant's argument to the contrary, there was testimony at trial that Bo Moore was a member of the HMC. (Trial Tr. Vol. 5, B. Burton at 33, 35; Trial Tr. Vol. 3, 1/4/10, D. Burnett at 71, 75-76; Trial Tr. Vol. 9, N. Sanchez at 118; Trial Tr. Vol. 7, C. Miller at 35-37; Trial Tr. Vol. 7, G. Peters at 92-93; Trial Tr. Vol. 10, C. Walker at 73.) More importantly, there is ample evidence that Defendant Bo Moore was aware of, participated in, and furthered the goals of the HMC enterprise, i.e., facilitating the drug and stolen property activities of the HMC enterprise, intimidating those who the HMC members thought had double-crossed them, and intimidating and threatening witnesses so as to discourage them from going to the police.

With regard to Bo Moore's role in directing the HMC enterprise's affairs, this "can be accomplished either by making decisions on behalf of the enterprise or by knowingly carrying them out." *Id.* Contrary to Defendant's arguments here, there was sufficient trial

evidence that he knowingly carried out decisions on behalf of the HMC enterprise.  For example, there was testimony that he helped Nagi collect on a drug debt and ample evidence concerning Bo Moore's involvement with the Wheat & Rye incident, particularly his efforts to intimidate Alan Kirchoff not to cooperate with the police or pursue any criminal charges against the HMC member Kirchoff identified to police as the person who assaulted him at the Wheat & Rye – Erick "Pok-a-Dot" Manners.

Focusing on the Wheat & Rye incident, the government introduced into evidence a December 23, 2005 phone conversation between Nagi and Bo Moore.  Apparently Alan Kirchoff owed HMC member Erick "Pok-a-Dot" Manners money for drugs, and when Kirchoff was spotted at a bar, another HMC member called Manners.  Kirchoff was later assaulted by Manners and other HMC members at a bar called the "Wheat & Rye."  Bo Moore got a call from Dad Moore and was told to contact Kirchoff.  (Gov't Ex. 43A.)  Bo Moore made it clear to Kirchoff that he did not just have a problem with Pok-a-Dot, he had a problem with the entire HMC criminal enterprise.

From the Nagi/Bo Moore call, it appears that Kirchoff told Bo Moore, "Your boys shot at me, they jumped me and hit me with beer bottles and stuff." (*Id.*)  Bo Moore told Kirchoff that he better not pursue charges against Erick Manners or he would be labeled a snitch and groups of the Highwaymen would be out looking for him and that he was going to get hurt bad because two or three of them might have "heaters." (*Id.*)  Bo Moore also told Kirchoff  that he should have paid his dope bill and warned him that HMC member Erick Manners "will hurt you." (*Id.*)  Below is some of what Bo Moore told Nagi about his conversation with Kirchoff:

BM:  Yeah, yeah that's what I said.  And Dad [Moore] called me . . .

and I called him and, uh, told him . . . look man they're going to label you as a snitch.  I said if you fuck with him. . . there's going to be twenty guys in them bars every night . . . looking for you damn near.  I said when they catch you, . . . probably two or three of them probably have pistols. . . you might not get so lucky. . . you need to think about that. . . it's a non-win situation for you.  I said . . . you need to think about it because you want to go down there and press charges. . . you're going to have to go to court and testify and stand up and testify and say that's him and everything else with multiple people in that court room looking at you.  I said they will label you as a snitch and everything else.  And I said plus it won't get no better because you won't be able to go to none of these bars.  I said cause they will be in there looking for you.   I said the ass whoopings won't be nice and the repercussions won't be nice.  I said I'm trying to be realistic with you and I said I don't even like you.  I said, shit, I was getting the phone calls to come up there last night.

AN:     Yeah.   You know what?   I could believe that.   I said this motherfucker has the motherfucking nerve to come and ID us bro.  I was like, what the fuck, he's a snitch?

* * *

BM:     Oh, like I told him.  I said bro, I said if you press the issue on Pok-a-Dot I said there'll be twenty guys in the bar at night.

* * *

BM:     . . . . And I said, . . . you need to pay your fucking dope bill and . . . if you go to the Police . . . I can't promise you ain't going to get hurt and hurt bad.  I said because there's going to be ten guys in a bar when Pok-a-Dot goes to jail. . . two or three of them might have heaters . . . they might put it on you bad.  I said all summer, all winter and summer long . . . you'll have it hard.

* * *

AN:     He did give [the police] a statement, OK.  But they want him to come down.

BM:     Yeah, JD said they wanted him to come down and so he can sign the papers and all that shit. . . . I said . . . listen you're not going to go press charges . . . if you want to be labeled as a snitch and have a bunch of motherfuckers, I said not fifty . . . about seventy-

33

five motherfuckers always out trying to find you . . . they will be in groups of five or ten.  And I said your friends ain't going to back you up . . . so you're going to be on your own . . . you're going to end up hurt . . . over your own negligence.  I said you want to be a bad ass, . . . and you're trying, and fucking with people, you don't even know who you're fucking with.  I said you got a feeling and an idea of it . . . but you really don't got the concept of it.

\* \* \*

BM:   So, . . . he won't got to the Police cause he's seeing that it's fucking a little bit more than he ever thought it would be with fucking trying to run his mouth.

AN:   Right.

\* \* \*

AN:   . . . .  I'm staying out of Allen Park.  They [the police] said we going to get you bitch. . . .  I was talking so much trash.

BM:   I going to take, hey, I going to take the Highwaymen sticker off my bike.

(Gov't Ex. 43A.)  (*See also* Gov't Ex. 122A, similar conversation between Nagi/Bo Moore regarding Kirchoff.)

Despite testimony to the contrary from the Allen Park police officers who interviewed Kirchoff and took his statement about the Wheat & Rye incident, Kirchoff testified at trial that he was too drunk to recall anything.  This evidence is sufficient to establish the third element of the substantive RICO count on which Defendant Bo Moore was convicted.

As to the fourth element, Defendant argues that there was insufficient evidence to satisfy the "continuity plus relationship" test.  (Def.'s Mot. at 12-13.)  "A pattern of racketeering activity requires a minimum of two predicate acts."  *Fowler*, 535 F.3d at 419.  Moreover, "to establish that any two predicate acts constitute a pattern of racketeering activity, the Government must satisfy the 'continuity plus relationship' test, which requires

34

proof of (1) a relationship between the predicate acts and (2) the threat of continued activity." *Id.* (internal quotation marks and citations omitted). Defendant Bo Moore argues that the two predicate acts that he was charged with do not satisfy this test because (1) the trial evidence showed only a buyer/seller relationship between him and Nagi and his personal use of marijuana and thus fails to show Bo Moore's participation in the affairs of the HMC enterprise; and (2) the evidence with respect to Myrtle Beach showed only individual motorcycle thefts and failed to tie that criminal activity to the HMC enterprise's criminal activity or part of a pattern of racketeering activity.

Contrary to Defendant Bo Moore's arguments here, there was sufficient trial evidence showing that Bo Moore's predicate acts were related to the HMC enterprise's activities. There was ample trial evidence showing that members of the HMC sold to or distributed/shared drugs with other members, that the HMC enterprise had a goal of furthering or facilitating this criminal activity, and that the drug activity alleged in Racketeering 11 (the Nagi drug conspiracy) was related to and an integral part of the HMC enterprise. There was testimony that membership provided a connection for drugs and created an opportunity to make money by selling those drugs. There was also evidence that HMC members provided protection for those engaged in drug activity and were also used to collect drug debts. Moreover, as discussed above, there is ample evidence that Nagi and Bo Moore had more than a buyer/seller, personal use relationship with drugs, i.e., evidence showing that Bo Moore was part of Nagi's drug crew and at least on one occasion helped Nagi collect a drug debt and thus facilitated the Nagi drug conspiracy.

There was also sufficient trial evidence connecting Defendant Bo Moore to the motorcycle theft conspiracy alleged in Racketeering Act 8 and connecting the motorcycle

35

thefts in Myrtle Beach to the HMC enterprise's patten of stealing and receiving stolen motorcycles or motorcycle parts. As the *Fowler* court observed, it is not required that the defendant's predicate acts be "directly interrelated with each other." *Id.* at 420. Rather, all that is required is that the predicate acts "be connected to the affairs and operations of the criminal enterprise." *Id.* (internal quotation marks and citation omitted). The evidence introduced by the government at trial was sufficient to satisfy this first prong of the "continuity plus relationship" test.

As to the second, continuity prong of that test, it "is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *Id.* (internal quotation marks and citation omitted). As in *Fowler*, "there is little doubt" that the HMC enterprise "was a long-term association that existed for criminal purposes," and there was sufficient evidence that Defendant Bo Moore "was operating as a part of it." *Id.*

### (2) RICO Conspiracy Conviction - Count 2

A RICO conspiracy charge, "merely requires proof that the defendant intended to further an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] criminal offense [and] it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Id.* at 421. There need not be direct evidence that the defendant "entered into an agreement to violate RICO." *Lawson*, 535 F.3d at 445. "[T]he agreement can be inferred from his acts." *Id.* Because the evidence shows that Defendant Bo Moore committed two RICO predicate acts, "a rational jury could infer that [Defendant] agreed that either he or someone else would commit at least two predicate acts. This is sufficient for a RICO conspiracy conviction because it shows that he intended to further an endeavor

36

which, if completed, would satisfy all of the elements of a substantive [RICO] criminal offense." *Id.* (internal quotation marks and citations omitted).

### (d) Sufficiency of Evidence on Counts 9 and 33 Convictions - Megdanoff Shooting Incident

Defendant Bo Moore was convicted on Count 9 of the Indictment which charged him with assault with a dangerous weapon in aid of racketeering in violation of 18 U.S.C. § 1959(a)(3).[11] The charges arise out of a shooting incident that occurred on April 14, 2006.

Charles Walker testified that, prior to this April 14, 2006 incident, he knew Defendant. They had a past history about a car Walker had sold to another guy but eventually went to Defendant Bo Moore. One day, Bo Moore, who Walker knew as a member of the Highwaymen, showed up at Walker's home along with other people. Walker had a group of people at his home at the time. Bo Moore told Walker that he had sunk a bunch of money into the car, but he did not have the title for it. Bo Moore wanted the title from Walker. Walker told him that he sold the car with the title to someone else. They got into an argument, and Walker smacked Bo Moore. Bo and the others then left. After that, one

---

[11]Count 9 of the Indictment alleges that:

1.     Paragraphs One and Two of Count Seven are re-alleged herein as if fully incorporated in this count.

2.     On or about April 14, 2006, in the Eastern District of Michigan, defendants Leonard "Bo" Moore, Robert Flowers, and others known and unknown to the grand jury, did knowingly, intentionally, and unlawfully, and for the purpose of maintaining and increasing position in the HMC, an enterprise engaged in racketeering activity, assault Don and Edith Megdanoff with a dangerous weapon, that is, a gun; in violation of Michigan Compiled Laws, Sections 750.82 and 767.39, and in violation of Title 18, United States Code, Section 1959(a)(5) and 2.

Second Superseding Indictment, Count Nine.

of Bo Moore's friends called Walker asking for the title.  Walker told him that Bo Moore should not have approached him at his home like he did, that all he had to do was ask him to get the title for him, and Walker would do it.  Walker testified that he did get the title. (Trial Tr. Vol. 10, C. Walker at 72-74, 84-85.)  This apparently did not settle the dispute.

Walker testified that on April 14, 2006, he was at the Happy Bar in Detroit with two friends of his.  While there, Walker noticed an individual named Rusty looking at him like he had a problem with him.  Walker went over to Rusty and asked him if he had a problem. Rusty told Walker that he had shot him back in the day.  Walker left Rusty and as he and his friends were leaving the bar, he could see Rusty on the phone.  Walker assumed that Rusty was talking on the phone with Bo Moore.

Walker's friends started to walk across the street to his vehicle, but Walker stopped in the middle of the street and turned around.  He was mad and wanted to confront Rusty again about his comment; he admits that he had been drinking and had a little "buzz." When he tied to open the door to the bar, it was locked.  (*Id.* at 74-76.)  Shortly after that, a couple of vehicles, including one with Defendant Bo Moore, came whipping up and slammed on their brakes.  One of the vehicles was a black Avalanche.  (*Id.* at 77-78.)

Defendant Bo Moore and the others got out of their cars and approached Walker "talking [as if] I was talking something about Bo."  Walker denied it and asked them what they meant.  (*Id.* at 79, 90-91.)  As Walker stepped back, Rusty came out of the bar and hit him from behind with some type of object.  Walker fell to the ground, and all the others piled on top of him, kicking and punching him.  After that, there was gunfire coming straight at him and from the direction where the Avalanche was parked, and the guys on him stopped for a moment.  Walker jumped up and ran to his Uncle Don Megdanoff's home

38

about two blocks down from the Happy Bar.  As he was running there, he ran right past the black Avalanche truck, and bullets were flying both ways.  Along the way, as he ran across the street, he saw a truck come around the corner.  The black Avalanche tried to run him over, but Walker reached out and grabbed a stop sign.  His body weight pulled his legs and everything out, and he slid to the ground.  As he did, bullets came reeling across over the top of his body.  The bullets were coming from the direction of the vehicle.  Once he got to his Uncle's home, the trucks came whipping around the corner.  (*Id.* at 79-82, 91-92, 111.)

When Walker turned to go back to the Happy Bar, his friends continued on to his vehicle.  One of his friends was the designated driver and had Walker's keys.  While Walker was down on the ground being kicked and punched, he saw one of his friends drive by in his car down the street to his Uncle's home.  His friend went down there in Walker's vehicle to get his Uncle and let him know what was going on.  When Walker reached his Uncle's, his vehicle was there, and he got in and left the area.  Walker started getting calls from Bo Moore and Meecho.  They repeatedly called and threatened to come and shoot up his house.  Walker testified that Bo Moore asked him if he shot somebody, and he said "No." There were so many calls, he stopped answering his phone.  At that time, Walker was not at his Uncle's and was unaware that his Uncle's and Aunt's home had been shot up and they had called 911.  The following day, Walker went to Henry Ford Hospital in Dearborn. While there, he was interviewed by the Dearborn police.  (*Id.* at 90, 94-97, 105, 108, 110, 112-114.)

Walker's Uncle, Don Megdanoff, testified that when Walker came to his home that night, he identified Bo Moore as one of the individuals who beat him up outside of the

39

Happy Bar, which was about 12 or 15 houses down the street.  Megdanoff got in his car and drove toward the Happy Bar.  As he got closer and slowed down, he saw Defendant Bo Moore walking towards a pickup truck located near the second house from the bar.  Bo Moore turned and looked at Megdanoff, took a couple steps toward him, and said, "You fuckin' want some of this, too?"  Megdanoff turned his head, kept on going down the street a bit, then turned around and went back home.  His nephew was not there when he returned home.  (Trial Tr. Vol. 11, D. Megdanoff at 59-62, 68-71.)

At that time, Don Megdanoff, his wife, their three children, his stepdaughter and her husband were all present at the Megdanoff home.  A HMC member and "honorary," Darrell Bryant, lives on Megdanoff's street, and his back yard is visible from Megdanoff's back deck.  About 5 or 10 minutes after Megdanoff returned home from the Happy Bar, three vehicles went to Bryant's home.  He could hear yelling and screaming coming from the direction of Bryant's home.  From his back deck, Megdanoff could hear Bryant yelling that Walker's Uncle and Aunt lived there, not Chuck [Walker].  He heard someone else yell, "I don't care, you're either with us or you're with them."  (*Id.* at 62-63.)  A few minutes later, three black  trucks pulled up in front of the Megdanoff home with their lights off.  Don Megdanoff was standing in the doorway, and his stepdaughter was on the porch right next to the doorway when shots rang out.  Shots hit the Megdanoff home; one about six inches from the right side of Don's head.  Don dropped to the floor right inside his doorway, in the inside hall.  His son-in-law was behind him.  His stepdaughter dropped to the porch cement floor and crawled up behind the ledge.  About 15 shots hit the Megdanoff home.  One hit the door jam, another one hit the porch light that was right above Don to the right.  One came through the doorway and hit the inside of his front door.  Another hit the storm door

40

to the upper flat (the Megdanoff family lived in the bottom flat).  There were more.  Don could not see who fired them.  After the house was shot up, Don called 911.  Because no one was shot, it took about an hour for the police to arrive.  (*Id.* at 63-67, 71-73, 75-76.)

The next day, the HMC neighbor, Darrell Bryant, came over to talk with Megdanoff. He was very apologetic, told Don that some of the older club members heard what happened and were pissed off.  He told Don that they wanted to pay for the damages to his home, but never did.  (*Id.* at 66-67.)

Other trial evidence shows Defendant Bo Moore's involvement in the Megdanoff shooting incident.  HMC member Lou Fitzner testified that he received a call that night from Nagi, telling him to meet him at "Meech" [Miseal Gonzales]'s house because JD [Johnny Jarrell] had been shot.  (Def.'s Ex. H, Oakwood Hospital Emergency Room records reveal that he was admitted at 1:56 a.m.)  Fitzner went to Meech's.  Nagi and Rusty told him that they got into a fight with Chuck Walker and another Charles at the Happy Bar; and as the HMC members were driving away, JD got shot in the leg in his truck.  Fitzner got in Nagi's black Range Rover SUV with him.  These two and Bo Moore, Rusty, and Bobby Flowers, all drove around the neighborhood looking for Charles Whaley and Chuck Walker so they could beat them down.  Bo Moore, Rusty and Flowers were in a silver grey Dodge Ram pickup truck.  They all drove down the street were the Happy Bar was located because they knew that one of them stayed in a house around there.  Eventually, they shot up a house. When Nagi and Fitzner got back to Meech's, Defendant Bo Moore, Rusty, and Bobby Flowers were discussing it.  Bobby Flowers said that he shot up the house.  (Trial Tr. Vol. 9, L. Fitzner at 18-23, 45-49.)

The government also introduced wire-tapped phone conversations corroborating

41

Walker's and Megdanoff's testimony.  The calls show that Defendant Bo Moore was involved in the Megdanoff shooting incident, that Bo Moore was talking "shit" on the phone, threatening families, was talking too much and got Nagi and the other HMC members in some shit (Gov't Ex. 87A, 4/14/06 Nagi/Fitzner call; Gov't Ex. 88A, 4/14/06 Nagi/Peters call).  The calls also show that JD got shot (Gov't Ex. 154A, Nagi/Flowers call); that the HMC members were agitated and out to get revenge (Gov't Ex. 155A, Bo Moore/Nagi call asking Nagi where he is and telling him that he should come there right away and not wait for "somebody to bring him something" because Bo Moore had "whatever" he needed); that Nagi had ten guys out there all "heated" up and Bo Moore messed it up by threatening families (Gov't Ex. 88A, 4/14/06 Nagi/Peters call); that Bo Moore went to the hospital trying to catch motherfuckers and looking for "that kid" (Gov't Ex. 89A, 4/15/06 Bo Moore/Nagi call where Bo Moore says he's called "the guy" and left messages that he want $7,000 from him to pay JD's doctor bills, etc.); that the Megdanoffs had already alerted the police and Nagi had already been stopped once by a fire marshall but didn't have anything on him because he dropped "it" somewhere (Gov't Ex. 87A, 4/14/06 Nagi/Fitzner call; Gov't Ex. 88A, Nagi/Peters 4/14/06 call); and Nagi was already planning an alibi if the police showed up at his home (Gov't Ex. 86A, Nagi/Shannon Borico 4/14/06 call where Nagi tells Shannon that JD had been shot and "we" had to take care of something, and instructs her to tell the police that Nagi was at his Sterling Heights home all night).

Despite Defendant's argument to the contrary, there was also evidence that Bo Moore carried a gun.  Phil McDonald testified that, although he did not see Bo Moore with a gun, he left one at McDonald's friend's house.  The friend later called and told McDonald to have Bo Moore come and get his gun.  (Trial Tr. Vol. 10, P. McDonald at 146-147.)  Likewise,

42

there was evidence that Defendant Bo Moore did more than just threaten people; he also assaulted them.  (Gov't Ex. 129A, 10/30/05 Bo Moore/Nagi call where Bo brags about beating someone up so bad that he "shit on hisself.")

Considering the trial evidence in the light most favorable to the government, as required under Rule 29, there was sufficient evidence to convict Defendant Bo Moore on Count 9.  The same is true for Count 33.[12]

In Count 33, Defendant Bo Moore was charged with violating 18 U.S.C. §§ 924(c) and 2.  As observed by the Sixth Circuit, "[a] defendant may be found to have brandished a firearm under an aiding and abetting theory of liability."  *United States v. Franklin*, 415 F.3d 537, 554 (6th Cir. 2005).  "[T]o sustain a conviction under [18 U.S.C.] § 924(c) for aiding and abetting, the government must prove 'that the defendant, as the accomplice, associated and participated in the use of the firearm in connection with the underlying . . . crime.'"  *United States v. Gardner*, 488 F.3d 700, 712 (6th Cir. 2007) (quoting *Franklin*, 415 F.3d at 554-55).  "The government can meet that burden by showing that the defendant both knew that the principal was armed and acted with the intent to assist or influence the commission of the underlying predicate act."  *Gardner*, 488 F.3d at 712.

---

[12]Count 33 of the Indictment alleges that:

On or about April 14, 2006, in the Eastern District of Michigan, Leonard "Bo" Moore, Robert Flowers, and others known and unknown to the grand jury, did knowingly, intentionally, and unlawfully, carry and use firearms, during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, specifically, assault with a dangerous weapon in aid of racketeering, as set forth in Count Nine of this indictment and which is incorporated by reference herein; in violation of Title 18, United States Code, Sections 924(c) and 2.

Second Superseding Indictment, Count Thirty-three.

The government presented sufficient evidence to allow a rational jury to convict Defendant Bo Moore on Count 33.  Evidence was presented from which a reasonable jury could infer that Bo Moore was present during the assault on the Megdanoffs, that he possessed a gun or knew that others present with him possessed guns, and that he acted with the intent to assist or influence the commission of the underlying crime of assault with a dangerous weapon.

The conclusion that there is sufficient evidence on Count 33 finds support in the Sixth Circuit's decision in *Rattigan v. United States*, 151 F.3d 551, 557-58 (6th Cir. 1998).  In *Rattigan*, the defendant argued that he could not "be convicted of 'using' a firearm in violation of § 924(c)(1) because no evidence was introduced to indicate that he actually possessed the gun." *Id.* at 557.  The court rejected the argument, observing that, under 18 U.S.C. § 2, "[a]ccomplice liability . . . holds one criminally responsible for acts that he or she assists or influences another in performance." *Id.*  It further explained that "[a]iding and abetting has been described as one's desire to in some sort associate himself with the venture, that he participate in it as something that he wishes to bring about, that he seek by his action to make it succeed." *Id.* at 557-58 (internal quotation marks and citations omitted).  It cautioned that "[t]he government must show that the defendant was a participant rather than merely a knowing spectator, that his presence at the scene of the crime was not surplusage, and that the crime would not have transpired without him." *Id.* at 558.  It then announced the standard that the Court applies here.  "This can be satisfied if the accomplice knows that the principal is armed and acts with the intent to assist or influence the commission of the underlying predicate act." *Id.*  That standard was met here. Applying the Rule 29 standard and Sixth Circuit precedent, this Court concludes that a

44

reasonable jury could infer from the evidence described above and at trial that Defendant Bo Moore knew that Bobby Flowers and others had a gun and acted with the intent to assist or influence the assault on the Megdanoffs.

## III.   Conclusion

For the above-stated reasons, Defendants' Rule 29 and Rule 33 motions are DENIED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  June 23, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 23, 2011, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager