UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                   Case No:  06-20465
                                         Hon:  Nancy G. Edmunds

D-6 LEONARD "BO" MOORE,

        Defendant.

_____/

## **RE-SENTENCING MEMORANDUM AND MOTION FOR VARIANCE**

Defendant D-6, Leonard "Bo" Moore, (hereinafter "Moore"), submits this Resentencing Memorandum after the Court of Appeals reversed his sentence and remanded same to this Court for resentencing.

Moore was convicted of count 1, violating RICO, a violation of 18 USC 1962(c); count 2, RICO conspiracy, a violation of 18 USC 1962(d); count 9, Violent Crimes In Aid of Racketeering Act (VICAR), a violation of 18 USC 1959(a)(3); count 15, Conspiracy to Transport Stolen Property, a violation of 18 USC 2313; count 19, Conspiracy to Distribute Controlled Substances, a violation of 21 USC 841, 846; and count 33, Use of a Gun in relation to the VICAR violation, a violation of 18 USC 924(c).

The Court of Appeals specifically found that Moore should be resentenced on count 19, utilizing a 5 year statutory maximum sentence. The Court found that although the "evidence" presented against Moore focused overwhelmingly on marijuana, and, to a

lesser degree, "cocaine," he could not be sentenced under statutory penalties for cocaine following a general verdict of conspiracy to distribute both cocaine and marijuana.

As a specific verdict form was not utilized, as was requested by Moore at his trial, the use of a general verdict form precludes the sentencing court from imposing a sentence "exceeding the shortest maximum sentence for any one of the pertinent violations" which in this case is five years for marijuana. The court specifically held that: "Moore should be re-sentenced upon a statutory maximum of five years." On appeal, the government agreed that resentencing was appropriate for this count.

The Court of Appeals also found that Moore should not have been sentenced to a ten year mandatory minimum sentence for discharging a firearm pursuant to 18 USC 924(c) as the intervening case of *Alleyne v. United States*, 133 S. Ct. 2151 (2013), precluded a sentencing court from increasing a mandatory minimum sentence on facts not found by a jury.

In this case, this Court exercised it's then discretion under *Harris v. United States*, 536 US 545 (2002), to find that Moore had discharged a firearm and was, therefore, subject to a ten year mandatory minimum sentence.

The Court of Appeals noted that, at the time of Moore's appeal, and after the parties submitted their briefs, the Supreme Court overruled *Harris* in *Alleyne*.

The Court of Appeals thus held, "Moore's sentence in violation of 924(c)(1)(A) must be vacated and remanded for resentencing consistent with the jury's verdict," which was use of a firearm, not discharge.

## GENERAL REMAND v. LIMITED REMAND

Moore submits that adjustments or enhancements found by this court at his original sentencing should be re-evaluated in the context of *Alleyne*. In so suggesting, Moore submits that the remand from the court of appeals was a general remand allowing this court to revisit the previous adjustments or enhancements to his sentence.

In the instant case, the Court in its remand order stated:

> Defendants convictions are affirmed. However, because the sentences for both Moore and Jarrell were tainted by the incorrect categorization of Viagra as a controlled substance, and because the district court improperly applied ten year mandatory minimum sentence on Moore's conviction for violating 18 USC 924(c)(1)(A), their sentences are reversed and remanded to the district court for resentencing consistent with this opinion.

The general outline of what the scope of a remand should be in this circuit is explained in *United States v. Moore*, 131 F3d 595 (6th Cir. 1997), where the court stated:

> 28 USC 2106 provides appellate courts with the authority to grant general or limited remands. [fn2]  *See Super X Drugs Corp. v. FDIC,* 862 F2d 1252, 1256 (6th Cir. 1988) (issuing limited remand under § 2106). *Accord United States v. Young*, 66 F3d 830, 835 (7th Cir. 1995) ("Pursuant to 28 USC § 2106, we many issue general or limited remands to the district court.") A general remand allows the district courts to resentence the defendant de novo, which means that the district court may redo the entire sentencing process including considering new evidence and issues. *See, e.g., United States v. Hebeka*, 89 F3d 279, 284 (6th Cir. 1996) (" '[T]here appears to be no prohibition in the guidelines … keeping a district court judge from revisiting the *entire* sentencing procedure unless restricted by the remand order.' ") (quoting *United States v. Duso,* 42 F3d 365, 368 (6th Cir. 1994)) (emphasis added). Conversely, a limited remand constrains the district court's resentencing authority to the issue or issues remanded. In *Duso* we explained that "[i]t is possible, as occurs in many

cases, that the remand would be a limited one which would not allow the district judge to make a de novo review of the sentencing procedure." *Duso, 42 F3d at 368.* Therefore, the question here is whether our remand order was general or limited. If we issued a general remand, then the district court retained the authority to consider the relevant conduct and enhancement issues. However, if we issued a limited remand, then the district court exceeded our remand order by considering those issues.

> FN2 28 USC §2106 reads:
>
> The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.

The interpretation of the mandate is a legal issue which we review de novo. *Pennington v. Doherty,* 110 F3d 502, 506 (7th Cir. 1997). In the absence of an explicit limitation, the remand order is presumptively a general one. As we held in *United States v. Jennings,* 83 F3d 145 (6th Cir. 1996), "[o]n remand, the only constraint under which the District Court must operate, for the purposes of resentencing, is the remand order itself. Where the remand does not limit the District Court's review, sentencing is to be de novo." *Id. At 151. See also United States v. Moored,* 38 F3d 1419, 1422 (6th Cir. 1994) ("absent explicit limitations in the appellate court's mandate, an order vacating a sentence and remanding the case for resentencing directs the sentencing court to begin anew, so that fully de novo resentencing is entirely appropriate …") (quotation omitted). Consequently, where an appellate court simply vacates a sentence and remands to the district court for "resentencing," that order is considered a general one that allows the district court to resentence the defendant de novo. *See, e.g., Young,* 66 F3d at 836; *United States v. Caterino*, 29 F3d 1390, 1394-95 (9th Cir .1994); *United States v. Cornelius,* 968 F2d 703, 705-06 (8th Cir. 1992).

4

In the instant case, the remand does not contain any language limiting the scope of the remand. The difference between the limited mandates and the general mandates is the presence of limiting language. *United v. O'Dell*, 320 F3d 674 (6th Cir. 2003).

In *United States v. Obi*, 542 F3d 148 (6th Cir. 2008), the Court of Appeals issued a mandate that read as follows:

> The guideline range with the obstruction of justice enhancement is 267-327 months; without this enhancement the range is 210-262 months. Obi was sentenced to 300 months imprisonment, obviously within the advisory range with the enhancement but significantly above the range without it. Even though we agree with the government that the district court considered the relevant 18 USC 3553(a) factors, because the court also considered an improperly calculated guideline range, the defendant's sentence is vacated and the case remanded to the district court for resentencing, consistent with this opinion.

In *Obi*, the court found that "although the appellate decision focused exclusively on obstruction, the mandate did not instruct the district court to limit its review to that particular issue…the court issued a general remand in *Obi* I and consequently provided the sentencing court with discretion to conduct a second sentencing hearing *de novo*. Therefore, the sentencing court acted within its authority to correct the evidentiary record and revisit the issue of obstruction." *At 154.*

In *Obi*, the court further found that:

> In this circuit, the criteria to establish a limited versus general remand are well established and, pursuant to 28 USC 2106, appellate courts have broad discretion in defining the scope of a given remand. (*Citations omitted*). A limited remand must 'explicitly outline the issues to be addressed by the district court and create a narrow framework within which the district court must operate. General remands, in contrast, give

district courts authority to address all matters as long as remaining consistent with the remand. (*Citations omitted*).  A 'majority of the circuits that have spoken on this issue, including this one, follow a basic rule that a district court can review sentencing matters *de novo* unless the remand specifically limits the lower court's inquiry.'

* * *

'[i]n light of the general principle of *de novo* consideration at resentencing, this court should leave no doubt in the district judges or parties' minds as to the scope of the remand.  The language used to limit the remand should be, in effect, unmistakable. *At 154*.

It should be noted that the remand order in the instant case and that in *Obi* is identical.  In the instant case, the Court of Appeals concluded, "the sentences are reversed and remanded to the district court for the resentencing consistent with this opinion."

Likewise, in *Obi*, in the remand order, the Court of Appeals concluded that "the defendant's sentence is vacated and the case remanded to the district court for resentencing consistent with this opinion."

It would also appear at first that one might believe that the "law of the case" doctrine may apply precluding this court from reconsidering sentencing issues raised on Moore's direct appeal.  It should be noted that the "law of the case" doctrine has limited application in the sentencing context.

As was stated in *United States v. Hebeka*, 89 F3d 279 (6th Cir. 1996):

Moreover, the "law of the case" doctrine has little applicability in the sentencing arena.  As we have previously noted, "there appears to be no prohibition in the guidelines, or in the case law interpreting the guidelines, keeping a district court judge from revisiting the entire sentencing procedure

6

unless restricted by the remand order." *United States v. Duso,* 42 F3d 365, 368 (6th Cir. 1994). In *United States v. Moored,* 38 F3d 1419, 1422 (6th Cir. 1994), we defined exceptions to the "law of the case" doctrine created by "several circuits [which give] broad discretion to the district court to reconsider sentencing factors on a sentencing remand." Hence, "absent explicit limitations in the appellate court's mandate, an order vacating a sentence and remanding the case for resentencing 'directs the sentencing court to begin anew', so that 'fully *de novo* resentencing' is entirely appropriate.' " *Id.* Nothing in our initial opinion limited the court below from resentencing *de novo*, and nothing prevents us from now reviewing the action taken by the district court on remand.

## APPLICATION OF ALLEYNE

In *Alleyne*, *supra*, the Supreme Court held that a sentencing court could not increase a mandatory minimum sentence on facts not found by a jury.

Moore submits that any adjustments or enhancements to the base offense for a count of conviction that increases the possible sentence for a defendant must be based on facts determined by a jury beyond a reasonable doubt.

The issue before the court in *Alleyne* was whether a mandatory minimum sentence, also referred to as the floor of a sentence, could be determined by the sentencing court on a preponderance of the evidence standard, as opposed to a finding by the jury on a reasonable doubt standard.

The *Alleyne* decision overruled *Harris v. United States* 536 US 545 (2002) where the Supreme Court had previously held that judicial fact finding that increased the mandatory minimum sentence for a crime was permissible under the Sixth Amendment, even in light of *Apprendi v. New Jersey*, 530 US 466 (2000), which held that a

sentencing court could not increase the maximum term of imprisonment based on facts that were not submitted to the jury and determined on a reasonable doubt standard.

In *Alleyne*, the court, at numerous times throughout the opinion and in support of its holding, made statements in support of defendant's claim that any adjustments or enhancements to the base offense for an offense of conviction must be determined by facts found by a jury on reasonable doubt standard.

In *Alleyne*, the court stated, "In *Apprendi*, we held that a fact is by definition an element of the offense and must be submitted to the jury if it increases the punishment above what is otherwise legally prescribed." *At 2158*.

The court further found that:

> *Apprendi's* definition of "elements" necessarily includes not only facts that increase the ceiling, but also those that increase the floor. Both kinds of facts alter the prescribed range of sentences to which a defendant is exposed and do so in a manner that aggravates the punishment. (*Citation omitted*).
>
> \* \* \*
>
> Facts that increase the mandatory minimum sentence are therefore elements and must be submitted to the jury and found beyond a reasonable doubt. *At 2158*.

The court in distinguishing "elements" from "sentencing factors," stated:

> Consistent with this connection between crime and punishment, various treatises defined "crime" as consisting of every fact which "is in law essential to the punishment sought to be inflicted." (Citations omitted). If a fact was by law essential to the penalty, it was an element of the offense.
>
> From these widely recognized principals, followed a well-established practice of including in the indictment, and

submitting to the jury, every fact that was a basis for imposing or increasing punishment. *At 2159.*

The *Apprendi* court in continuing with this analysis stated:

> Consistent with common-law and early American practice, *Apprendi* concluded that any "facts that increase the prescribed range of penalties to which a criminal defendant is exposed" are elements of the crime. (Citation omitted). We held that the Sixth Amendment provides defendants with the right to have a jury find those facts beyond a reasonable doubt. (Citation omitted). While *Harris* limited *Apprendi* to facts increasing the statutory maximum, the principal applied in *Apprendi* applies with equal force to facts increasing the mandatory minimum.
>
> It is indisputable that a fact triggering a mandatory minimum alters a prescribed range of sentences to which a criminal defendant is exposed. *At 2160.*

The *Alleyne* court in its thoughtful analysis also referred to treatises on criminal law including J. Bishop, Criminal Procedure 50 (2d Ed. 1872), for the proposition that "if a statute prescribes a particular punishment to be inflicted on those who commit under its special circumstances which it mentions, or with particular aggravations," then those special circumstances must be specified in the indictment." *At 2160.*

The *Alleyne* court concluded that "facts increasing the  legally prescribed floor aggravate the punishment," *at 2161;* and "[T]his reality demonstrates that the core crime and the fact triggering the mandatory minimum sentence together constitute a new, aggravated crime, each element of which must be submitted to the jury." *At 2161.*

Continuing the court stated:

> As noted, the essential Sixth Amendment inquiry is whether a fact is an element of a crime. When a finding of fact alters the legally prescribed punishment so as to aggravate it, the

9

> fact necessarily forms a constituent part of a new offense and must be submitted to the jury… [T]he essential point is that the aggravating fact produced a higher range, which, in turn, conclusively indicates that the fact is an element of a distinct and aggravated crime. It must, therefore, be submitted to the jury and found beyond a reasonable doubt. *At 2163.*

The court in *Alleyne*, after these strong pronouncements as to the basis for its decision, stated in what could be characterized as dicta, the statement that:

> We take care to note what our holding does not entail. Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial fact finding, does not violate the Sixth Amendment. *At 2163.*

In *United States v. Johnson*, 732 F3d 577 (6th Cir. 2013), defendant pled guilty to an amount that resulted in a 10 year mandatory minimum sentence. The trial court found by preponderance of the evidence the total amount of cocaine base attributable to Johnson and sentenced him accordingly. The trial court attributable amount was above the minimum but below the maximum sentence.

The court in Johnson found: "no constitutional error, [however], because *Allyene* did not extend *Apprendi* to facts that do not increase the described statutory penalties." (referencing the above quotation from *Alleyne*).

Judicial discretion in sentencing is appropriate, but not if it increases the applicable sentencing guideline range as that increases the potential penalty.

Moore submits, however, that any adjustment to a base offense that increases the offense level and thus the applicable guideline range, is a fact which is "essential to the

penalty" and thus an "element of the offense" and encompassed by the above-quoted language from *Alleyne.*

Such adjustments according to *Alleyne* should be submitted to the jury as they are a "fact that was a basis for imposing or increasing punishment."

Such adjustments also "alter[s] a prescribed range of sentences to which a criminal defendant is exposed."

Obviously, adjustments or enhancements to a base offense prescribe a "range of sentences to which a criminal defendant is exposed," and should thus be a jury determined fact found by a reasonable doubt standard  and not a judge determined fact found on a preponderance of the evidence standard.

## ARGUMENT ON DISPUTED FACTS RELATING TO INTERSTATE THEFT AND DRUG QUANTITIES

This Memorandum will present facts and law as they relate to the sentencing of Moore by making reference to two of the three groups of offenses that are identified under "Offense Conduct" and "Offense Level Computations."   Those two groups are identified as Group 1, relating to the Transporting and Receiving of Stolen Vehicles from Myrtle Beach, South Carolina, and  Group 2, relating to the Conspiracy to Distribute Controlled Substances.

## GROUP 1

### TRANSPORTING   AND   RECEIVING   STOLEN VEHICLES (Count 1, Act 8)

### CONSPIRACY TO PARTICIPATE IN THE AFFAIRS OF AN INTERSTATE ENTERPRISE THROUGH A PATTER OF RACKETEERING ACTIVITY (Count 2)

## AND CONSPIRACY TO TRANSPORT STOLEN PROPERTY IN INTERSTATE COMMERCE (Count 15)

This group relates to Mr. Moore's conviction on count 15, which is a conspiracy to transport stolen property in interstate commerce, in violation of 18 USC 2312, 371 and Racketeering Act 3 of the RICO charge in count 1 and the conspiracy to commit to RICO charge in count 2. These counts of conviction relate to the alleged thefts of motorcycles during "Bike Week" in Myrtle Beach in May of 2006.

With respect to paragraph 33 of the PSI, it should be noted that the PSI identifies, according to records provided by the government, 15 motorcycles as stolen and having a mean value of $35,000 each, as they were custom-built bikes.  The undersigned has reviewed these records and suggests that, in fact, there were 13 possible motorcycles identified as stolen during the time period that Moore was in Myrtle Beach and that the total value for those  motorcycles would be under $200,000.

The PSI wants to attribute all of the motorcycles stolen during "Bike Week" in Myrtle Beach in May of 2006 to the HMC, including Moore.  Over 100,000 people attend "Bike Week" and there are tens of thousands of motorcycles present at that time.  There are undoubtedly other people who steal motorcycles during "Bike Week." It is pure speculation to suggest that all motorcycles stolen during "Bike Week" were stolen by the HMC.  There is no evidence to support that fact.

It is further observed that, according to the records referenced in paragraph 33, a description of the motorcycles stolen during the time period, as reported by the Myrtle

Beach Police Department, do not relate to the two motorcycles attributable to Moore, one being a black and white Harley and the other being a green chopper.

Moore thus raises a dispute as to the loss calculation in the Presentence Investigation Report and submits that the court may not summarily adopt factual findings in the report but is required to make specific factual findings on the record to support the loss figure.  See *United States v. Ross,* 502 F3d 521 (6th Cir. 2007).

In the context of estimates of drug quantities, the Sixth Circuit has held: "[W]e previously have instructed that 'when choosing between a number of plausible drug quantities…a court must err on the side of caution."  *United States v. Darwich*, 337 F3d 645, 661 (6th Cir. 2003), quoting from *United States v. Walton*, 908 F2d 1289, 1302 (6th Cir. 1990).  A similar analysis should apply in the context of estimating loss amounts for theft offenses.

Furthermore,  it should be noted that Moore was convicted both of RICO counts in counts 1 and 2, in violation of 18 USC 1962(c), 1962(d) and 1963(a), pertaining to the stolen motorcycles and a substantive count in count 15 of conspiracy to transport stolen property in interstate commerce, a violation of 18 USC 3212 and 371.

In determining the amount of motorcycles and therefore the loss amount, and the number of victims, this Court has to determine Moore's accountability pursuant to USSG 1B1.3(a)(1)(B).  As an aid to the trial courts in determining such conduct, the Sixth Circuit in *United States v. Orlando*, 281 F3d 586, 600, stated:

> In interpreting section 1B1.3(a)(1)(B) of the United States Sentencing Guidelines, which discussed relevant conduct for the purpose of a defendant's accountability where "jointly

undertaken criminal activity" occurred, this court has explained that "the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy." *United States v. Swiney*, 203 F3d 397, 402 (6th Cir. 2000).

Noting that "under the Sentencing Guidelines, a defendant is accountable for the conduct of other co-conspirators only if that conduct was (1) reasonably foreseeable to him, and (2) in furtherance of the jointly undertaken criminal activity."

* * *

In applying the sentencing guidelines to particular defendants who have been convicted for their role in a conspiracy, a district court must differentiate between the co-conspirators and make individualized findings of fact for each defendant.

In this context, the Sixth Circuit has also held that, "[W]hen a defendant is being held accountable for the actions of others, that conduct must have been in furtherance of activity that the defendant jointly undertook with others, and it must have been known or reasonably foreseeable to him. *United States v. Hoskins*, 173 F3d 351 (6th Cir. 1999).

Evidence relating to Myrtle Beach consisted of the testimony of cooperators, who were Highwaymen Motorcycle Club (HMC) members who cooperated with the government.

Robert Burton testified that Moore was at Myrtle Beach with him and had a radio from a motorcycle that was stolen but he never saw the radio or motorcycle. (Burton, 11/9/10, p. 63). Burton further indicated that Moore and Gary Ball, Jr. had been stealing motorcycles and Burton took possession of a green chopper and Moore dropped off a black and white motorcycle. (Burton, 11/9/10, p. 70). He indicated that he had storage of

the green chopper and sold it to William Bridges but the FBI missed getting that during their searches.  (Burton, 11/9/10, p. 124).

William Bridges said that he bought a green chopper from Burton in 2007 and Burton said that that motorcycle was stolen from Myrtle Beach.  (Bridges, 11/10/10, p. 18).

Gerald Peters indicated that Moore told him that he got a lot of motorcycles and they were brought back in a U-Haul.  Moore did not say who stole the motorcycles. (Peters, 11/15/10, p. 36, 45).  Moore further indicated that Robert Burton and Gary Ball, Jr. were fighting over motorcycles.  (Peters, 11/15/10, p. 36).

Louis Fitzner indicated that he helped Gary Ball, Jr. and Eugene Trumph (G-No) unload three motorcycles from a U-Haul trailer and they indicated to him that they had stolen those motorcycles.  (Fitzner, 11/17/10, p. 42-44).

Lastly, Philip McDonald testified that, in June of 2006, he was with Moore at a bar and Moore told him that he had stolen a lot of motorcycles and had made a lot of money. (McDonald, 11/19/10, p. 9).

It is believed that the only motorcycle recovered during the course of this investigation that was traced to Myrtle Beach was a motorcycle seized at Southwest Transmission, which  was owned and operated by Eugene Trumph.  The FBI conducted several years investigation of the HMC, including the execution of over 60 search warrants and five Title III wiretaps.  They also conducted surveillance and did a round-up at the mandatory bike inspection in May of 2006.  At no time was there evidence presented that Moore was in possession of any motorcycle stolen from Myrtle Beach.

Indeed, he was not even present at the mandatory bike inspection in May of 2006 when over 100 HMC members were detained.

It should be noted in Count 15 that 18 individuals were charged in this conspiracy. The conspiracy then alleges 10 overt acts, none of which identify Moore as being involved, in any way, in either the transportation or receipt of stolen motorcycles from Myrtle Beach to Michigan. The allegations in Count 15 in summary, indicate that Gary Ball, Jr. and Doug Burnett planned to steal motorcycles in Myrtle Beach and that Robert Burton rented a U-Haul truck. Further, that John Duffey drove the U-Haul to South Carolina and returned to Michigan with stolen motorcycles. Furthermore, that Fitzner, Trumph and Ball, Jr. unloaded motorcycles at Southwest Transmission. Again, no indication of Moore being involved in any way in either the theft or receipt of stolen motorcycles.

Moore submits that there is a lack of substantiated and credible evidence that he was involved in the transportation of stolen motor vehicles from Myrtle Beach. All of the witnesses who testified had credibility problems, not only because of the significant crimes that they had committed in the past, but, also because of the leniency they were expecting from the government in asking this Court for reductions in their otherwise significant sentences for crimes they had yet to plead guilty or not being charged at all.

Moore submits that he should only be accountable for the one motorcycle recovered in Michigan that was traced to a motorcycle stolen in Myrtle Beach.

Moore objects to the amount of loss attributable to him in the Presentence Investigation Report and although he believes there are no stolen motorcycles that should

be attributable to him, as he was convicted of this count, the only motorcycle that should be attributable to him is the motorcycle recovered at Southwest Transmission.

In paragraph 58, Moore objects to an offense characteristic of more than 10 victims for the reason that none of the motorcycles stolen in Myrtle Beach during the time period that he was there can be attributable to him or, in fact, anybody, as the descriptions of the motorcycles stolen in Myrtle Beach from the incident reports from the Myrtle Beach Police Department, do not correspond to the descriptions of motorcycles testified to by government witnesses.

Moore objects to paragraph 59 as there is no evidence that he was a person in the business of receiving and stealing stolen property as one of two primary means of financially supporting himself and the motorcycle club. No motorcycles stolen from Myrtle Beach were found in his possession. Although two search warrants were executed at his residence, no stolen motorcycles were recovered, let alone, any stolen from Myrtle Beach.

In conclusion, Moore objects to the adjustments found in the PSR and previously found by this Court at Moore's original sentencing. Specifically, Moore objects to a finding of an amount of loss of more than $200,000 adding 12 levels pursuant to 2B1.1(b)(1)(G), more than 10 victims adding two levels pursuant to 2B1.1(2)(A)(i), the offense involving receiving stolen property and the defendant was a person in the business of receiving and selling stolen property as one of the two primary means of financially supporting himself and the motorcycle club adding two levels pursuant to

2B1.1(b)(4) and the offense involved an organized scheme to steal and to receive stolen vehicles adding two levels pursuant to 2B1.1(b)(12)(A).

A determination by the sentencing court of these adjustments on a preponderance of the evidence standard is a violation of Moore's Sixth Amendment rights to have a jury determine these sentencing factors that increase his sentence by a reasonable doubt standard.

## GROUP 2

### CONSPIRACY TO DISTRIBUTE CONTROLLED SUBSTANCES (Count 1, Act 11)

### CONSPIRACY TO PARTICIPATE IN THE AFFAIRS OF AN INTERSTATE ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY (Count 2)

### CONSPIRACY TO POSSESS WITH INTENT TO DISTRIBUTE, AND DISTRIBUTION OF, CONTROLLED SUBSTANCES (Count 19)

In Count 19, Moore was charged in a conspiracy to possess with intent to distribute and distribution of controlled substances, the so-called Aref Nagi conspiracy. This conspiracy involved 29 other co-defendants. The indictment alleges 23 specific, what appear to be overt acts, as part of this conspiracy. In paragraph 6, it is alleged that Moore sold quantities of cocaine to Aref Nagi and in paragraph 10, it is alleged that Aref Nagi sold large quantities of Viagra to Moore. That Count also alleges Nagi conspired with others involving marijuana, ecstasy and Oxycotin. The evidence at trial revealed the following as described by the HMC cooperators.

Douglas Burnett testified that Lou Fiztner, Moore and Johnny Jarrell helped Nagi in drugs and that Nagi dealt mostly in marijuana. (Burnett, 11/4/10, p. 43-46). He once observed Jarrell and Moore and Nagi collect money. (Burnett, 11/4/10, p. 46). However, when asked who had drug transactions with Nagi, he said that Jarrell, Fitzner and G-No (Eugene Trumph) did. (Burnett, 11/4/10, p. 47). He said that Jarrell, Moore and Nagi had their own crew and they did weed. (Burnett, 11/4/10, p. 48). Burnett further testified that, while cooperating with the government, he did controlled purchases from Robert Burton, Aref Nagi, Gary Ball, Jr. and Anthony Viramontez. (Burnett, 11/4/10, p. 51-52). He also indicated that the term "scoobs" referred to drugs for personal consumption. (Burnett, 11/8/10, p. 22).

Robert Burton also indicated that "scooby snacks" were personal supplies to get high. (Burton, 11/9/10, p. 42). He said that Moore distributed weed but he didn't know this as he himself didn't smoke. (Burton 11/9/10, p. 50).

Gerald Peters testified that he sold cocaine and the individuals he got cocaine from were Robert Burton and Darrell Bryant. (Peters, 11/15/10, p. 19, 23). He further indicated that Moore would smoke a joint but did not share it. (Peters 11/15/10, p. 27).

Louis Fitzner testified that he was not aware of any drug dealing that Moore was involved in. (Fitzner 11/17/10, p. 28).

William Bridges identified himself as a cocaine dealer but had no relationship with Moore. (Bridges 11/10/10, p. 6, 10).

19

Nat Sanchez testified that he did not know of any cocaine dealers in the HMC. (Sanchez 11/7/10, p. 13). He further indicated that "scoobs" were a small amount and were used to calm somebody. (Sanchez 11/17/10, p. 16).

Lastly, Philip McDonald indicated that he distributed steroids to Moore. (McDonald 11/18/10, p. 34). Steroids are not included in Count 19, but was a separate count, being Count 18, for which Moore was acquitted.

As previously stated, two search warrants were executed at Moore's residence, one in December of 2005 and another in May of 2006. At neither time, were controlled substances involved in Count 19 seized.

What is also significant is that cooperators Doug Burnett and Philip McDonald made controlled purchases of controlled substances from known drug dealers. Neither of these individuals made purchases from Moore.

To prove a narcotics conspiracy under 21 USC 846, "the government must prove, beyond a reasonable doubt, (1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy." *United States v. Welch,* 97 F3d 142, 148 (6th Cir. 1996).

To be guilty of a conspiracy, the government must prove that Moore was aware of the object of the conspiracy and that he voluntarily associated himself with it to further its objectives. *United States v. Hodges*, 935 F2d 766, 772 (6th Cir. 1991.

A buyer/seller relationship alone is not sufficient to establish participation in a drug conspiracy. *United States v. Gibbs*, 174 F3d 762, 776 (6th Cir. 1999.

Although only "slight" evidence is needed connect a defendant to a conspiracy, "mere association with conspirators is not enough to establish participation in a conspiracy." *United States v. Pearce,* 912 F2d 159, 162 (6th Cir. 1990); *Gibbs, supra at 776.*

The accountability determinations, as aforementioned in the analysis of the stolen motorcycles attributable to Moore, apply with equal force to a determination of the amount of controlled substances attributable to Moore. *See, Darwich, supra; Monus, supra; and, Hoskins, supra.*

The *Gibbs* court quoted the following admonition which is especially relevant to this indictment with 29 people charged in Count 19 and over 91 people charged in the indictment:

> The distinction (regarding mere association) is especially important today when so many prosecutors seek to sweep within the dragnet of conspiracy all those who have been associated in any degree whatever with the main offenders. *Gibbs at 776.*

There was also evidence brought in through intercepted Title III calls between Nagi and Moore relating to their interest in "scooby snacks."  This includes call number 4111 made on October 22, 2005 (Exhibit 29A); call 11665 made on December 23, 2005 (Exhibit 122A); call 17681 made on March 19, 2006 (Exhibit 59A); call 2547 made on October 17, 2005 (Exhibit 127A); call 6609 made on November 1, 2005 (Exhibit 131A), and call 227 made on April 14, 2006 (Exhibit 147A). These calls all relate to their mutual interest in sharing "scooby snacks" which has been identified by several witnesses as

personal supplies (Burton), personal consumption (Burnett) and a small amount to calms somebody (Bridges).

Moore submits that the evidence submitted does not show that he was involved in a conspiracy to distribute any type of controlled substance and that he was merely a buyer or seller of small amounts of "scooby snacks," and an occasional user of marijuana. These acts do not rise to the level of being a member of a conspiracy to distribute controlled substances as alleged in Count 19.

Furthermore, the obtaining of the "scooby snacks" by Moore and Nagi is a situation where they were joint purchasers and/or possessors of controlled substances with the intent to merely share it between themselves as users.  As such, they cannot be guilty of possession with intent to distribute a controlled substance.  *United States v. Swiderski*, 548 F2d 445 (2nd  Cir. 1977).

The only evidence of his involvement was reflected in six telephone calls between himself and Nagi where they discussed "scooby snacks" which numerous witnesses have testified to be personal use of cocaine.  There is also minimal evidence of his smoking marijuana.

There is no evidence, let alone concrete evidence, of his involvement in the controlled substances that are being attributable to him.

As was stated previously, if there was a greater conspiracy to be involved in these types of controlled substances, there is no evidence that he associated with such an endeavor within the scope of his agreement with Nagi or others, or was conduct of co-conspirators foreseeable by him.

The Sixth Circuit Court of Appeals  has found that there is a two-prong test that must be satisfied before a defendant is held accountable for the conduct of others:  "(1) the conduct must be in furtherance of the jointly undertaken criminal activity;  and  (2) the conduct must be reasonably foreseeable in connection with that criminal activity." *United States v. Campbell*, 279 F3d 392 (6th Cir. 2002).

In *Campbell*, the court found that the district court must "make particularized findings with respect to both the scope of the defendant's agreement and the foreseeability of his co-conspirator's conduct before holding the defendant accountable for the scope of the entire conspiracy."

As previously noted, the Court of Appeals held that Moore could only be sentenced for the statutory penalties for marijuana where there was  a general verdict of conspiracy to distribute both cocaine and marijuana.

Specifically, the Court of Appeals  in its opinion held that, "Moore should be resentenced on a statutory maximum of five years."  The government agreed that resentencing was appropriate in this regard.

Moore, thus, objects to the PSI making him accountable for the listed controlled substances and the corresponding guideline calculations.

A determination by the sentencing court of the amount of drugs attributable to Moore on a preponderance of the evidence standard is a violation of Moore's Sixth Amendment rights to have a jury determine sentencing factors that increase his sentence by a reasonable doubt standard.

## MOTION FOR VARIANCE

On April 10, 2014, the United States Sentencing Commission proposed amendments to Congress which included a two-level across the board lowering of base offense levels in the Drug Quantity Table. (Exhibit A).

Although this amendment is not effective until November 1, 2014, Moore submits that he should get the benefit of this as historically all if not the mass majority of amendments proposed to Congress are adopted.

If the court accepts the two-level lowering of his drug base offense level, Moore will agree in writing to waive the filing of a 3582(c) motion for a reduced sentence when the amendment goes into effect in November 2014.

## SENTENCING CONCLUSIONS

In conclusion, Moore submits that the following offense levels should apply to him.

Group 1 – Transporting and receiving stolen vehicles. The base offense level should be 6 with no enhancements for loss amount, victims or the defendant being in the business of receiving and selling stolen property.  However, for RICO, the base offense level would be 19 pursuant to 2E1.1.

Group 2 – Conspiracy to distribute controlled substances. Inasmuch as he as can only be held accountable for the marijuana because of the lack of a special verdict form, it is suggested that the amount should be under 1 kg, which is a base offense level of 8. The statutory maximum for the marijuana would be 5 years.  However, for RICO, the offense level would be 19 pursuant to 2E1.1.

Group 3 – Assault with a dangerous weapon in aid of racketeering.  The base offense level is correctly stated in the PSR at 14, which corresponds to the base offense level for unlawful conduct relating to racketeer influence and corrupt organizations, pursuant to 2E1.3(a)(2) and 2A2.2(a).

The resulting offense levels for count 1, being the substantive RICO charge  and count 2 being the conspiracy to commit RICO are 19; and count 9 being the assault with a dangerous weapon in aid of racketeering  is 14.  With a criminal history III, the resulting guideline range is 37 to 46 months.   In addition, there will be a consecutive sentence pursuant to 18 USC 924(c), which pursuant to the Court of Appeals  decision is a mandatory minimum of 60  months.

Respectfully submitted,

/s/ Edward C. Wishnow
Edward C. Wishnow (P22472)
Attorney for Defendant
240 Daines
Birmingham, MI  48009
(248) 258-1991
edwishnow@aol.com

Dated:  May 7, 2014